**NEW LINE CINEMA CORPORATION, the Elm Street Venture, and the Fourth New Line–Heron Venture, Plaintiffs,**

v.

**BERTLESMAN MUSIC GROUP, INC. Zomba Enterprises, Inc., Zomba Recording Corp., D.J. Jazzy Jeff and the Fresh Prince, W. Smith, J. Townes, and P. Harris, Defendants.**

No. 88 Civ. 5181 (RJW).

United States District Court, S.D. New York.

Aug. 29, 1988.

Solin & Breindel, P.C. (Kenneth I. Schacter, Alan Seife, of counsel), Blumenthal & Lynne, P.C. (Benjamin Zinkin, of counsel), New York City, for plaintiffs.

Berger & Steingut (Robert A. Weiner, Kenneth Anderson, Jonathan Barzilay, of counsel), New York City, for defendants.

## OPINION

ROBERT J. WARD, District Judge.

Plaintiffs, New Line Cinema Corporation, The Elm Street Venture and the Fourth New Line–Heron Venture ("New Line"), have moved pursuant to Rule 65, Fed.R. Civ.P., for a preliminary injunction enjoining defendants, Bertlesman Music Group, Inc., Zomba Enterprises, Inc., Zomba Recording Corp., D.J. Jazzy Jeff and the Fresh Prince, W. Smith, J. Townes and P. Harris ("Zomba"), from manufacturing, advertising, distributing, selling, or releasing for public broadcast, telecast or other exhibition during the pendency of this litigation, a music video entitled "A Nightmare on My Street." For the reasons that follow, plaintiffs' motion is granted.

## BACKGROUND

Beginning in 1984, New Line produced and distributed a series of motion pictures ("the Nightmare series") featuring a distinctive character named Freddy Krueger. The films were entitled "A Nightmare on Elm Street" ("Nightmare I"), "A Night-mare on Elm Street Part 2—Freddy's Revenge" ("Nightmare II"), and "A Nightmare on Elm Street Part 3—Dream Warriors" ("Nightmare III"). Most recently, on August 19, 1988, New Line released a fourth film in this series entitled "A Nightmare on Elm Street Part 4—Dream Master" ("Nightmare IV"). New Line is the undisputed owner of the copyrights in the Nightmare series.

The principal element of the films in the Nightmare series is the character of Freddy Krueger ("Freddy"), the only character appearing in all four Nightmare films. Transcript of Preliminary Injunction Hearing held August 17, 1988 ("Tr."), at 9. Plaintiffs have spent a significant amount of money creating, developing and marketing Freddy. Tr. at 10. Freddy, who is played by actor Robert Englund in the films, is a vicious and frightening killer who is responsible for the deaths of many of the other characters in the Nightmare series. Freddy has a distinctive physical appearance: his face is exceptionally scarred and distorted by severe burns; he wears a battered fedora hat which partially obscures his burned face and a dirty red and green striped sweater; he speaks in a low, rasping terrifying voice; and on his right hand he wears a leather glove whose fingers consist of razor-sharp knives. Freddy utilizes his gloved hand to slash to death other characters in the films.

The Nightmare series is distinctive in a number of other ways. The series is set in an old, abandoned house on Elm Street, with many of the murders occurring there at night. In addition, the series involves the interaction of reality and dreams. Freddy appears to inhabit the characters' dreams but he frequently transcends their dream states and becomes real. This is somewhat distinctive because, according to the plot line, the real Freddy, a murderer of twenty children, was burned alive a number of years before by the parents of children on Elm Street.

The Nightmare series has been extraordinarily successful and is indeed the core of

New Line's business.[1] New Line has spent millions in producing, distributing and marketing the series and its characters. Tr. at 10. As a result of New Line's efforts, Freddy is a well-recognized character who is readily identifiable with the Nightmare series.

Due to the popularity of Freddy, New Line has been able to further promote Freddy and the series with a number of licensed products. New Line has authorized *Nightmare* series posters, *T-shirts*, dolls, action figures, blow-up dolls, cards, tops, chewing gum, stickers, and Freddy killer gloves and has obtained approximately $2 million per year in licensing fees and royalties. Tr. at 18. New Line decides which products it will authorize based on the quality and type of product as well as the financial package.[2]

During the latter part of 1987 and early 1988, in anticipation of the release of Nightmare IV in late summer, New Line decided to authorize the production of a music video based on the Nightmare series. The video was to be released in conjunction with the release of the fourth movie. New Line wished to use the music video as a marketing tool to promote the newest movie. It had used a music video to promote the Nightmare series previously because such videos are a common way to enhance penetration of the 15–24 year age market. Tr. at 19–20. New Line decided that because 40 percent of the Nightmare series audience was Black, it would be giving something back to this audience by producing a Rap music video. Tr. at 14, 21.

As early as October 1987, New Line began looking for an appropriate rap group to appear in the video. New Line communicated with a number of rap groups independently as well as a rap group agency. Tr. at 21–22. In December of 1987, New Line began negotiating with the manager of the "Fat Boys," a popular rap group. Tr. at 22. The negotiations led to a proposed written agreement, which was neither signed nor finalized, by early March of 1988. Tr. at 23.

Meanwhile, in January of 1988, Barry Weiss, vicepresident of marketing/operations of Jive Records (which is affiliated with Zomba), contacted New Line to discuss the possibility of D.J. Jazzy Jeff and the Fresh Prince ("D.J. Jazzy Jeff"), a popular rap group, doing a video based on the Nightmare series, which would be jointly marketed with the movie. Tr. at 31. The music for the proposed video featured a song written by D.J. Jazzy Jeff entitled "A Nightmare on My Street," which was recorded in the winter of 1987. Weiss sent Michael Harpster, the New Line senior vice-president for marketing, a tape of the song.

In March of 1988, Weiss met with Kevin Benson, New Line's director of licensing and director of music, to discuss the music video proposal. Tr. at 33. At this meeting, Benson informed Weiss that New Line was also negotiating with the Fat Boys to do a song about the fourth Nightmare series movie. Benson, however, continued to express interest in Weiss's proposal and suggested Weiss inform others at New Line about the potential benefits of using D.J. Jazzy Jeff. Accordingly, Weiss sent letters to a number of New Line employees, describing his ideas for the project. On March 30, 1988, Weiss and Benson discussed further the business aspects of the

---

1. Testimony by Kevin Benson, Director of Licensing and Director of Music at New Line indicated that Nightmare I had a production cost of $1.8 million and grossed $26 million, Nightmare II had a production cost of $2.4 million and grossed $32 million, and Nightmare III had a production cost of $4.7 million and grossed $44 million. Nightmare IV, which was recently released, had a production cost of $6.0 million. Transcript of Preliminary Injunction Hearing held August 17, 1988 ("Tr.") at 8.

2. As explained by Kevin Benson,

We maintain that we have a character that we would like to keep as long as possible and so we adhere to stringent guidelines in terms of how the character looks, how people reproduce the character. We also are very concerned about making sure that each and every person who purchases something related to our character gets a value for their dollar spent, because what we do not want to do is have people out there associate things with the character that are not of a value that keep them pleased and supportive of the character. Tr. at 18–19.

proposal. Weiss reduced his proposal to writing on April 4, 1988. Benson orally responded to the proposal by informing Weiss that the proposal was financially unacceptable to New Line. Tr. at 35–37. Weiss indicated that he would not improve the proposal. Tr. at 38–39.

On April 5, 1988, Zomba released the album "He's the DJ, I'm the Rapper," which contained the song "A Nightmare on My Street." The album became an immediate hit. Concerned about possible copyright infringement, New Line solicited an opinion of counsel. Tr. at 65–66.

Subsequently, New Line finalized the agreement with the Fat Boys. Tr. at 39. The contract between New Line and the Fat Boys provides that in exchange for authorizing the use of the Nightmare themes and characters, New Line will share in the royalties earned by the Fat Boys' song and video.[3] When Weiss contacted Benson on May 18, 1988, Benson informed him that the Fat Boys had been selected to produce the music video. Tr. at 110. Weiss immediately sent Benson and Harpster a memorandum in an attempt to get New Line to change its mind. The memorandum indicated that MTV was interested in doing a music video of "A Nightmare on My Street." Weiss telephoned Harpster the following day to inquire about the status of his proposal and Harpster apparently indicated that the Fat Boys deal was not yet finalized and that he would get back to Weiss. Tr. at 110. Harpster did not do so and on June 15, 1988, Weiss sent Benson a mailgram asking for a response to his proposal and indicated that if he did not hear from Benson by the following day, he would assume that the Fat Boys deal had been closed. Tr. at 112.

Weiss received no response from Benson and learned that New Line had entered into a music video agreement with the Fat Boys by reading an advertisement in the June 25th issue of Billboard Magazine. Tr. at 119.

On July 18, 1988, Weiss received a letter from Seth Willinson, senior vice-president of New Line, informing him that New Line believed that "A Nightmare on My Street" infringed New Line's copyright. Willinson demanded that Zomba cease producing records containing the song and withdraw existing records from the market place.

On July 25, 1988, New Line commenced the instant action against Zomba asserting copyright infringement pursuant to the Copyright Act of 1976, 17 U.S.C. § 101 *et seq.* ("the Copyright Act" or "the Act"); false designation of origin, unfair competition, injury to reputation, and dilution and appropriation of property rights pursuant to the Lanham Act, 15 U.S.C. § 1125(a); and unfair competition pursuant to § 368–d of New York General Business Law. In this action, New Line seeks both monetary damages and equitable relief. On July 26, 1988, Zomba, while not admitting liability, proposed to add a disclaimer sticker to the packaging of their compact disks, cassette, albums and singles containing "A Nightmare on My Street."[4] New Line informed Zomba that it was not interested in working with Zomba to develop a disclaimer.

In the first week of August, New Line learned that Zomba had produced and was seeking to broadcast a rap music video of "A Nightmare on My Street." Unbeknownst to New Line, this video had been produced on July 25 and 26, even though the negotiations between New Line and Zomba had fallen through and even though Zomba was fully aware of New Line's agreement to produce an authorized rap video with the Fat Boys. Tr. at 123, 127. Believing that the unauthorized music vid-

---

**3.** Specifically, the deal between New Line and the Fat Boys provides that the Fat Boys give New Line 4 percent of retail sales on 12–inch singles, 4 percent of retail sales on the 7–inch singles, override of pro rata 4 percent over 10 sides on the album, and a third of the publishing with administration in perpetuity. Tr. at 26.

**4.** The proposed disclaimer reads as follows:

"Nightmare on My Street" is not part of and has not been embodied in the soundtrack of any "Nightmare on Elm Street" motion picture. This record is not authorized, licensed or affiliated with the "Nightmare on Elm Street" films, New Line Cinema Corp., The Elm Street Venture or the Fourth New Line/Heron Venture.

eo infringed its copyright and would create confusion, especially due to the impending release of Nightmare IV and the authorized Fat Boys video entitled "Are You Ready for Freddy?" ("Fat Boys video"), New Line on August 12, 1988 moved by order to show cause for a preliminary injunction and sought a temporary restraining order to enjoin the release and broadcast of the unauthorized video. On August 12, 1988, the Court heard argument on the temporary restraining order at which point the Court viewed part of Nightmare I and the "A Nightmare on My Street" video. Although it did not grant the temporary restraining order, the Court was made aware that MTV had been informed of the litigation and would probably not broadcast the "Nightmare on My Street" video before the preliminary injunction hearing.

On August 17, 1988, the Court held an evidentiary hearing on New Line's motion for a preliminary injunction. In preparation for the hearing, the Court had viewed Nightmare I in its entirety and again watched the "A Nightmare on My Street" video. At the hearing, Benson and Harpster testified on behalf of New Line and Weiss and Claudia Ann Carli, Vice–President of Artist Development of Jive Records, testified on behalf of Zomba. On August 22, 1988, the Court granted a temporary restraining order which was to be followed by a decision on the motion within ten days.

## DISCUSSION

In this Circuit, preliminary injunctive relief will be granted only upon "a showing of (a) irreparable harm and (b) either (1) likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief." *Roso–Lino Beverage Distributors v. Coca–Cola Bottling Co.*, 749 F.2d 124, 125 (2d Cir.1984) (quot-

ing *Jackson Dairy, Inc. v. H.P. Hood & Sons*, 596 F.2d 70, 72 (2d Cir.1979)).

### I. *Irreparable Harm*

The first element that this Court must find to issue a preliminary injunction is that unless the injunction issues, New Line will be irreparably injured. In the instant case, the Court finds both that a presumption of irreparable injury exists and that New Line presented credible evidence that it would suffer irreparable harm if the "A Nightmare on My Street" music video was released.

In this Circuit, a presumption of irreparable injury exists for the purpose of a preliminary injunction determination once plaintiffs have made out a prima facie case of copyright infringement. *Wainwright Securities, Inc. v. Wall Street Transcript Corp.*, 558 F.2d 91, 94 (2d Cir.1977), *cert. denied*, 434 U.S. 1014, 98 S.Ct. 730, 54 L.Ed.2d 759 (1978); *Craft v. Kobler*, 667 F.Supp. 120, 130 n. 13 (S.D.N.Y.1987). To establish a prima facie case of copyright infringement for the purposes of obtaining an injunction, the movant must show ownership of a valid, existing copyright and copying of the copyrighted material by the defendant. *Novelty Textile Mills v. Joan Fabrics Corp.*, 558 F.2d 1090 (2d Cir.1977) (citing 2 M. Nimmer, The Law of Copyright § 141 at 611 (1976) ("Nimmer")).

Exhibits introduced at the preliminary injunction hearing establish that New Line has valid, existing copyrights in the Nightmare series.[5] Tr. at 70. Thus, pursuant to the Copyright Act, 17 U.S.C. § 106, New Line has the exclusive right "to prepare derivative works based upon the copyrighted work." A derivative work is defined as "a work based upon one or more preexisting works, such as a translation, musical arrangement, dramatization, fictionalization, motion picture version, sound recording, art reproduction, abridgement, condensation, or any other form in which a work may be recast, transformed, or adapted." 17 U.S.C. § 101.

---

**5.** Because New Line has valid copyrights in the Nightmare series, it is clear that it has acquired copyright protection as well for the character of Freddy. *See Warner Brothers, Inc. v. American*

*Broadcasting Companies, Inc.*, 720 F.2d 231, 235 (2d Cir.1983) (citing *Detective Comics, Inc. v. Bruns Publications, Inc.*, 111 F.2d 432 (2d Cir. 1940)).

The Court also finds that copying of the Nightmare series has been established by the fact that the D.J. Jazzy Jeff music video is substantially similar to Nightmare I.[6] Because there are so many similarities, the Court will limit its discussion to the similarities that are the most obvious and important.

Initially, the title of the allegedly infringing video and song, "A Nightmare on My Street," closely parallels the title of the copyrighted work, "A Nightmare on Elm Street." In both works, the central character is a villainous individual named "Freddy" who has a burnt face.[7] Both Freddys have a low, raspy, and frightening voice.

Most significantly, each Freddy has a gloved hand with sharp implements protruding from the fingers. It is this characteristic that is most identified with Freddy in the Nightmare series because Freddy uses this glove, out of which razor sharp blades protrude, to attack and slash his victims. In the D.J. Jazzy Jeff video, the lyrics of the song refer to the sharp implements as "claws" and "nails." In actuality, the makers of the video utilized phonograph tonearms with protruding needles. During the music video, these tonearms are used to slash Prince and Jeff, other characters in the music video. However, the construction of both leather gloves is quite similar. Tr. at 70.

The imagery, setting, and plot of the D.J. Jazzy Jeff video are also substantially similar to the imagery, setting, and plot of Nightmare I. In much of the video, Prince's room is aflame and as described by the lyrics "burning like an oven." Similarly, Nightmare I uses heat and fire imagery throughout. As noted above, Freddy in Nightmare I had been burned alive by parents of the twenty children he had murdered. Freddy brought his child victims to a boiler room. The opening sequence of the film occurs in this boiler room with smoke and flames. Both the video and Nightmare I are set in an abandoned, poorly lit, and highly threatening old house.

In Nightmare I, Freddy inhabits the dreams of all of the characters but transcends their dream state to become real. Similarly, Freddy in the D.J. Jazzy Jeff video inhabits Prince's dream but when Prince awakens he realizes Freddy is real. When Tina, Freddy's first victim, awakes from her dream of Freddy, she realizes Freddy is real because her nightgown has slash marks. When Prince awakes from his dream of Freddy, he realizes Freddy is real because his sheet has slash marks. In both the movie and video, Freddy attacks the victims when they are in bed asleep and is capable of appearing and disappearing instantaneously.

In another scene in Nightmare I, Nancy, the heroine of Nightmare I, is awakened from her nightmare by the ringing of her alarm clock. She believes that the danger to her has passed, but then she is attacked by Freddy. Similarly, in the music video, Prince's alarm clock rings and awakens him from his nightmare. He believes that it was all a dream, but then he is attacked by Freddy. At a different point in the film, Nancy wakes up and finds Freddy's hat in her bed which leads her to conclude that Freddy is not just a dream. In the music video, Prince finds Freddy's necklace in his bed when he awakes, forcing him to conclude that Freddy is not just a dream.

Towards the end of the film, Nancy attempts to alert her friend Glen to warn him about Freddy, but Glen's parents prevent her from speaking with him. In the music video, Prince calls his friend Jeff to warn him about Freddy. Prince yells at Jeff not to fall asleep just as Nancy begged Glen not to fall asleep. Ultimately, Jeff is murdered by Freddy in the video and Tina, Glen and others are murdered by Freddy in

---

6. Zomba essentially conceded access to the material by admitting that the individuals who wrote the lyrics to the "A Nightmare on My Street" had viewed the movie. Tr. at 114.

7. Although Zomba contends that their make-up man was instructed not to make their Freddy with a burnt face, the Court finds that the heavily wrinkled face nonetheless appears to be burnt in the music video. Tr. at 129. Moreover, the lyrics to the song indicate that Freddy is "burnt like a wienie." Prince, a character in the D.J. Jazzy Jeff video, tells Freddy that "your face is all burnt" as he gives Freddy a mirror.

the movie. Following Jeff's murder, Freddy taunts Prince by saying "I'm your D.J. now, Princey." Similarly, in Nightmare I, following Glen's death, Freddy taunts Nancy by saying "I'm your boyfriend now, Nancy."

Additional references to the movie in the video include Jeff going to the movies with Tina, his girlfriend, who shares the same name as Freddy's first victim in Nightmare I. The lyrics indicate that Freddy wears the same sweater and hat all the time. In the Nightmare series, Freddy always appears in a dirty red and green striped sweater and fedora hat. In the music video, Prince, Jeff, and their dates see the movie "Elm Street" which features "Fred" and "Nancy." This obviously refers to Nightmare I, which features Freddy Krueger and Nancy. Finally, although New Line did not heavily rely on this similarity at the hearing, it is clear to the Court that the D.J. Jazzy Jeff music video very heavily borrows from the theme music of Nightmare I.

At the hearing, Zomba claimed that the Court should not find substantial similarity between the two works because the two Freddys are different in many ways. Zomba argued that their Freddy was intentionally designed to be different so not as to infringe the copyrighted Freddy of the Nightmare series. Tr. at 128, 131. In support of this contention, Zomba cites the change in Freddy's appearance, such as a leather jacket and sneakers instead of a sweater, and the rap aspects of the video, including phonograph tonearms, speaker units in Freddy's ear, the fade box haircut, sunglasses, and a gold chain. Zomba also conceded, however, that it was always its intention for the Freddy in its music video to represent the Freddy of the Nightmare series. Tr. at 103–104, 139. As noted by the Second Circuit:

> Ultimately, care must be taken to draw the elusive distinction between a substantially similar character that infringes a copyrighted character despite slight differences in appearance behavior, or traits, and a somewhat similar though non-infringing character whose appearance, behavior, or traits, and especially

their combination, significantly differ from those of a copyrighted character, even though the second character is reminiscent of the first one. Stirring one's memory of a copyrighted character is not the same as appearing to be substantially similar to that character, and only the latter is infringement.

*Warner Bros. Inc. v. American Broadcasting Companies, Inc.,* 720 F.2d 231, 242 (2d Cir.1983).

In light of the numerous significant similarities between the two works, many of which go to the heart of the Nightmare series, the Court concludes that this is not a case of similar non-infringing character, but rather a situation where the Freddy character and the music video of "A Nightmare on My Street" are substantially similar to the original Freddy and the movie "Nightmare on Elm Street."

Although Zomba has lamely argued that the two works are not substantially similar, Zomba has not denied that the many similarities described above exist. Tr. at 159. Rather, Zomba has made the argument that "A Nightmare on My Street" is a parody of "A Nightmare on Elm Street." As discussed below, the Court does not believe that "A Nightmare on My Street" falls within the ambit of fair use. Accordingly, New Line has established a prima facie case of copyright infringement and irreparable injury is presumed. *Wainwright Securities Inc. v. Wall Street Transcript Corp., supra,* 558 F.2d at 94.

Although it is unnecessary to make such a finding, the Court also believes a finding of irreparable injury is supported by the facts. New Line presented evidence that it would suffer irreparable harm by the effect the "A Nightmare on My Street" video is likely to have on the sales of the Fat Boys song. Testimony established that the songs promoted by the two videos are in direct competition in the rap music market. Tr. at 102–3. Certainly, with two competing videos in the music marketplace, each video will get less promotional time on MTV. The decrease in air time of the Fat Boys video will undoubtedly result in lower

album sales for the Fat Boys single. Fewer sales of the record will result in lower profits for New Line. The situation is particularly egregious in light of the fact that, unless enjoined, the planned release of the D.J. Jazzy Jeff video will occur within a week of the release of Nightmare IV. Zomba will be unjustly enriched if it is permitted to benefit at New Line's expense from the massive promotional campaign on behalf of Nightmare IV. Again, because there is no way of calculating a damage award to reflect the extent of lowered Fat Boy album sales due to the D.J. Jazzy Jeff video, the harm to New Line is irreparable.

In addition, testimony established that, in many ways, the video has the potential to denigrate rather than promote the Nightmare series. Tr. at 51. It is more cheaply made and less professionally done than the Fat Boys video and portrays Freddy as a character somewhat different in behavior and appearance from the original Freddy. Tr. at 52, 79–81. However, because of the many similarities between Nightmare I and the D.J. Jazzy Jeff video, the public is likely to believe that the video is somehow related to the Nightmare series.[8] Tr. at 52. As a result, the lower quality of the music video, in combination with the changed Freddy, could dissuade potential viewers from going to see the movie. The harm would be irreparable because there would be no way of calculating how many people would decide not to see the movie based on watching the music video.

## II. *Serious Questions with Respect to the Merits*

■ In the Court's view, there is no doubt that this case presents sufficiently serious questions going to the merits to make them a fair ground for litigation. The primary issue before the Court is to what extent the fair use doctrine protects a parody promoting a product that is in direct competition with a derivative parody promoting a derivative product produced by the owners of a copyrighted work.

### A. The Fair Use Doctrine

The doctrine of fair use establishes a limited privilege "in others than the owner of a copyright to use the copyrighted material in a reasonable manner without his consent, notwithstanding the monopoly granted to the owner." *Wainwright Securities Inc. v. Wall Street Transcript Corp., supra,* 558 F.2d at 94 (quoting *Rosemont Enterprises, Inc. v. Random House, Inc.,* 366 F.2d 303, 306 (2d Cir.1966), *cert. denied,* 385 U.S. 1009, 87 S.Ct. 714, 17 L.Ed.2d 546 (1967)); *Fisher v. Dees,* 794 F.2d 432, 435 (9th Cir.1986).[9] The fair use doctrine "balances the public interest in the free flow of ideas with the copyright holder's interest in the exclusive use of his work." *Warner Bros. Inc. v. American Broadcasting Companies, Inc., supra,* 720 F.2d at 242. As described by the Second Circuit, fair use distinguishes between "a true scholar and chiseler who infringes a work for personal profit." *Wainwright Securities Inc. v. Wall Street Transcript Corp., supra,* 558 F.2d at 94 (quoting Hearings on Bills for the General Revision of the Copyright Law Before the House Comm. on the Judiciary, 89th Cong. 1st Sess., ser. 8, pt 3, at 1706 (1966) (Statement of John Schulman)).

The Copyright Act enunciates the fair use doctrine as follows:

---

**8.** While the D.J. Jazzy Jeff video includes a disclaimer at the end, this Court does not believe that a disclaimer is an adequate remedy. First, there is no guarantee that MTV would run the tape through to its end. Even if the tape was played in its entirety, interruptions, such as commentaries by the hosts regarding upcoming songs, would distract the attention of the audience from the disclaimer. Moreover, the nature of music video channels is to present in rapid succession a number of songs. Thus, the audience is likely to have a short attention span and be doing other things during the presentation of the video. Consequently, a disclaimer would have little, if any, effect.

**9.** The fair use doctrine was originally developed by the courts as an equitable defense to copyright infringement. This doctrine was later codified by Congress in 17 U.S.C. § 107. Section 107 requires a case-by-case determination whether a particular use is fair, and the statute supplies four nonexclusive factors to be considered. *Harper & Row, Publishers, Inc. v. Nation Enterprises,* 471 U.S. 539, 549, 105 S.Ct. 2218, 2225, 85 L.Ed.2d 588 (1985).

[T]he fair use of copyrighted work, including such use by reproduction in copies or phonorecords or by any other means specified by [section 106], for purposes such as criticism, comment, news reporting, teaching ... scholarship, or research, is not an infringement of copyright.

17 U.S.C. § 107. In the legislative notes accompanying this section, Congress listed examples of the "sort of activities the Courts might regard as fair use under the circumstances." 17 U.S.C. § 107 (Historical Note) (quoting Notes of Committee on the Judiciary, House Report No. 94–1476), U.S.Code Cong. & Admin.News 1976, p. 5659. One of these activities is "use in a parody of some of the content of the work parodied." *Id.* Parody, however, was "not classified as a *presumptively* fair use" and thus, an assertion of the parody defense "must be considered individually, in light of the statutory factors, reason, experience, and, of course, the general principles developed in past cases." *Fisher v. Dees, supra,* 794 F.2d at 435. *See also Elsmere Music, Inc. v. National Broadcasting Company, Inc.,* 482 F.Supp. 741, 745 (S.D. N.Y.1980), *aff'd,* 623 F.2d 252 (2d Cir.1980) (court must examine the facts of each case).

### B. Nature of a Parody

Zomba asserts that "A Nightmare on My Street" is a protected fair use because the purpose and nature of its copying of Nightmare I and Freddy was parody. Courts have found that more extensive use of another's copyrighted work is permitted in creating a parody than in creating other types of fictional and dramatic works. *Elsmere Music, Inc. v. National Broadcasting Company, Inc., supra,* 482 F.Supp. at 745. The reason for this is that functional differentiation between a serious work and a satire based upon it normally prevents the parody from fulfilling the demand for the original. *Id.* Moreover, parody is believed to be a socially useful literary genre notwithstanding the fact that many authors of serious works do not like to be parodied. Nimmer, The Law of Copyright, § 1305[D], at 13.90.10.

A workable definition of parody that has been suggested by one district court is that "a parody is a work in which the language or style of another work is closely imitated or mimicked for comic effect or ridicule." *Metro–Goldwyn–Mayer, Inc. v. Showcase Atlanta Cooperative Productions, Inc.,* 479 F.Supp. 351, 356 (N.D.Georgia 1979) (quoting *Dallas Cowboys Cheerleaders v. Pussycat Cinema, Ltd.,* 467 F.Supp. 366, 376 (S.D.N.Y.1979), *aff'd,* 604 F.2d 200 (2d Cir.1979)). The court, however, goes on to quite properly point out that:

[I]n order to constitute the type of parody eligible for fair use protection, parody must do more than merely achieve comic effect. It must also make some critical comment or statement about the original work which reflects the original perspective of the parodist—thereby giving the parody social value beyond its entertainment function. Otherwise, any comic use of an existing work would be protected, removing the "fair" aspect of the "fair use" doctrine and negating the underlying purpose of copyright law of protecting original works from unfair exploitation by others.

*Id.* at 357.

The Court has serious doubts about whether the D.J. Jazzy Jeff video constitutes a parody under this definition. The work does not appear to make a critical comment or statement about Nightmare I reflecting a unique perspective. In fact, the video does not appear even to be making fun of the movies themselves. Rather, the video serves solely an entertainment and promotional function for Zomba's song. However, it is undisputed that the music video contains some comic elements and "pokes fun" at Freddy. Tr. at 84. Thus, at least for the purposes of this motion, the Court will assume that the D.J. Jazzy Jeff video is a parody.

### C. The Statutory Factors

Even considering the D.J. Jazzy Jeff video as a parody, the Court does not believe that it constitutes a fair use of Nightmare I. Congress has set forth certain factors to be considered in determining whether

**1526**

the use made of a work in any particular case is a fair use, namely:

(1) the purpose and character of the use, including whether such use is of a commercial nature or is for non-profit educational purposes;

(2) the nature of the copyrighted work;

(3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and

(4) the effect of the use upon the potential market for or value of the copyrighted work.

17 U.S.C. § 107. The Court will discuss each of these factors below.

### 1. *Purpose and Character of the Use*

In evaluating the purpose and character of the alleged infringing use, the Court should consider whether the motivation for the work is commercial or non-profit educational. The Supreme Court has indicated that "every commercial use of copyrighted material is presumptively an unfair exploitation of the monopoly privilege that belongs to the owner of the copyright." *Harper & Row, Publishers, Inc. v. Nation Enterprises*, 471 U.S. 539, 562, 105 S.Ct. 2218, 2231, 85 L.Ed.2d 588 (1985). The Second Circuit has also acknowledged the importance of this factor: "While commercial motivation and fair use can exist side by side, the court may consider whether the alleged infringing use was primarily for public benefit or for private commercial gain." *MCA, Inc. v. Wilson*, 677 F.2d 180, 182 (2d Cir.1981). *See also Consumers Union of United States, Inc. v. General Signal Corp.*, 724 F.2d 1044, 1049 (2d Cir. 1983), *cert. denied*, 469 U.S. 823, 105 S.Ct. 100, 83 L.Ed.2d 45 (1984) (commercial use alone does not defeat a fair use defense); *Iowa State University Research Foundation, Inc. v. American Broadcasting Companies, Inc.*, 621 F.2d 57, 61 (2d Cir.1980) (it is "relevant" to fair use whether work was used for "commercial exploitation"). The essence of the commercial/non-profit distinction is "not whether the sole motive of the use is monetary gain but whether the user stands to profit from exploitation of the copyrighted material without paying the customary price." *Harper & Row,*

*Publishers, Inc. v. Nation Enterprises, supra,* 471 U.S. at 562, 105 S.Ct. at 2231.

In this case, there is no question that the purpose of the D.J. Jazzy Jeff music video is purely commercial. It is undisputed that the video exists solely as an vehicle to promote Zomba's song. Tr. at 122–23. Thus, Zomba stands to profit financially by using Freddy without making the usual licensing arrangements, which in fact were made by the Fat Boys before they produced their video. The Court's findings with respect to this factor weigh against fair use.

### 2. *Nature of the Copyrighted Work*

When considering the nature of the copyrighted work, the Court "may consider, among other things, whether the work was creative, imaginative, and original, ... and whether it represented a substantial investment of time and labor made in anticipation of a financial return." *MCA, Inc. v. Wilson, supra,* 677 F.2d at 182. In addition, the Supreme Court has observed that a fair use defense is more easily upheld with respect to fact works because the law "generally recognizes a greater need to disseminate factual works than works of fiction or fantasy." *Harper & Row, Publishers, Inc. v. Nation Enterprises, supra,* 471 U.S. at 563, 105 S.Ct. at 2232.

It is undisputed that the Nightmare series and the character of Freddy Krueger are creative, imaginative and original and represent a substantial investment of time and money by New Line. Tr. at 168. There is also no question that the series is a work of fiction or fantasy as opposed to a factual work. The Court must conclude that this factor also weighs against a finding of fair use.

### 3. *The Amount and Substantiality of Use*

This factor concerns the extent of the defendant's copying. "Use of copyrighted material without the owner's consent generally will not be considered reasonable if it extensively copies or paraphrases the original or bodily appropriates the research upon which the original was based." *MCA, Inc. v. Wilson, supra,* 677 F.2d at 183. In

the case of a parody, this factor is interpreted more liberally: "A parody is entitled at least to 'conjure up' the original. Even more extensive use would still be fair use, provided the parody builds upon the original, using the original as a known element of modern culture and contributing something new for humorous effect or commentary." *Elsmere Music, Inc. v. National Broadcasting Company,* 623 F.2d 252, 253 n. 1 (2d Cir.1980).

There are three factors to consider in determining whether a taking is excessive: 1. the degree of public recognition of the original work; 2. the ease of conjuring up the original work in the chosen medium; and 3. the focus of the parody. *Fisher v. Dees, supra,* 794 F.2d at 432 (adopting Second Circuit approach but adding three factors described above).

Even under the Second Circuit's liberal approach with respect to parody, the Court believes that Zomba appropriated more than is permitted. Because Freddy is a widely recognized major character in the Nightmare series, very little would have been needed to bring the image of Freddy and the Nightmare series into the minds of the music video viewers. *See Walt Disney Productions v. Air Pirates,* 581 F.2d 751, 757 (9th Cir.1978), *cert. denied,* 439 U.S. 1132, 99 S.Ct. 1054, 59 L.Ed.2d 94 (1979) (due to widespread public recognition of Disney characters, very little was necessary to conjure them up). Instead of using just the claw or just the slash marks or just the music or just the plot or just the imagery or just the murderous personality or just the dream sequences, Zomba appropriated them all and thereby attempted to make money not on the strength of its own imagination and originality but rather by trading on the imagination and originality of the creators of the Nightmare series.

Moreover, because the medium of video is so similar to the medium of motion pictures in that they both share audio and video, it would have been a simple matter to utilize one or two aspects of the Nightmare series to conjure it up. Instead, Zomba's appropriation of so many different elements of New Line's work, which as a whole constitute the heart of Nightmare I, appears to have no purpose other than to capitalize financially on New Line's original work. *See Walt Disney Productions v. Air Pirates, supra,* 581 F.2d at 758.

Although the Court is not clear what focus the music video has apart from attempting to promote the single "A Nightmare on My Street," the Court finds that assuming that the focus is to poke fun at Freddy, Zomba has taken much more "from the original than is necessary to accomplish reasonably its parodic purpose." *Fisher v. Dees, supra,* 794 F.2d at 439. It is quite clear that much less appropriation of New Line's work could have easily brought the Nightmare series into the general audience's mind. In view of Freddy's recognition, the music video medium, and the focus of the parody, the Court believes that Zomba's taking was excessive. Accordingly, this factor also weighs against fair use.

### 4. Effect of Use upon the Potential Market

Under this factor, the Court must consider the effect of the alleged infringing use upon the potential market for or value of the copyrighted work. This factor is "widely accepted to be the most important." *Consumers Union of United States, Inc. v. General Signal Corp., supra,* 724 F.2d at 1050 (quoting *Triangle Publications, Inc. v. Knight–Ridder Newspapers, Inc.,* 626 F.2d 1171, 1177 (5th Cir. 1980)). *See Harper & Row, Publishers, Inc. v. Nation Enterprises, supra,* 471 U.S. at 566, 105 S.Ct. at 2234 (effect on the market is "undoubtedly the single most important element of fair use"). Because the copyright laws exist to stimulate artistic creativity for the benefit of the public, care must be taken to ensure the artist has sufficient financial motivation for creativity. *MCA, Inc. v. Wilson, supra,* 677 F.2d at 183. *See also Harper & Row, Publishers, Inc. v. Nation Enterprises, supra,* 471 U.S. at 546, 105 S.Ct. at 2223 ("The rights conferred by copyright are designed to assure contributors to the store of knowledge a fair return for their labors.").

Where a claim of fair use is asserted, "a balance must sometimes be struck between the benefit the public will derive if the use is permitted and the personal gain the copyright owner will receive if the use is denied." *MCA, Inc. v. Wilson, supra,* 677 F.2d at 183. Essentially, "[t]he less adverse effect that an alleged infringing use has on the copyright owner's expectation of gain, the less public benefit need be shown to justify the use." *Id.*

In evaluating the effect of the allegedly infringing use upon the market for the copyrighted work, a court is not limited to the copyrighted work itself, but should also consider plaintiff's derivative works, either already in existence or potential, that may be adversely affected by the allegedly infringing work. *See Harper & Row, Publishers, Inc. v. Nation Enterprises, supra,* 471 U.S. at 568, 105 S.Ct. at 2235 ("This inquiry must take account not only of harm to the original but also of harm to the market for derivative works."); *Fisher v. Dees, supra,* 794 F.2d at 438 ("infringement occurs when a parody supplants the original in markets the original is aimed at, or in which the original is, or has reasonable potential to become, commercially valuable"); *Roy Export Company v. Columbia Broadcasting System,* 503 F.Supp. 1137, 1146 (S.D.N.Y.1980), *aff'd,* 672 F.2d 1095 (2d Cir.1982), *cert. denied,* 459 U.S. 826, 103 S.Ct. 60, 74 L.Ed.2d 63 (1982) (concept of "effect upon ... the copyrighted work" must also apply to derivative work even if original work not harmed).

As described by Nimmer, a "functional test" is applied:

In determining the effect of the defendant's use upon the potential market for or value of the plaintiff's work, a comparison must be made not merely of the media in which the two works may appear but rather in terms of the function of each such work regardless of media. The irrelevance of media in making this determination is apparent in the following example. Suppose A is the copyright owner of a published novel. B produces a motion picture copied from and substantially similar to A's novel. The motion picture may well not adversely affect the sale of A's novel. In fact it almost certainly will have the opposite effect. It is nevertheless clear that B may not invoke the defense of fair use. B's motion picture has not prejudiced the sale of A's work in the book medium, but it has certainly prejudiced the sale of A's work in the motion picture medium. If the defendant's work adversely affects the value of any of the rights in the copyrighted work (in this case the adaptation right) the use is not fair even if the rights thus affected have not as yet been exercised by the plaintiff.

Nimmer, § 13.05[B], at 13–84–85.

In the instant case, the Court finds that Zomba's video, if released, is likely to harm the value of the derivative use of Nightmare I in the rap video market.[10] There is no doubt that defendants' parody would supplant or at the very least compete with a derivative version of Nightmare I in the music video market, a market in which Nightmare I has reasonable potential to become commercially valuable. In fact, testimony at the hearing unequivocally established that the songs "Nightmare on My Street" and "Are You Ready for Freddy?" are in direct competition. Tr. at 102. Applying Nimmer's functional analysis, the Court believes that the two music videos and the singles they promote fulfill the same function in terms of potential consumer demand. Tr. at 102–3. Thus, the unauthorized video could have a detrimental impact upon the sales of the Fat Boys song that would result in direct financial loss to New Line. Because the D.J. Jazzy Jeff video will harm the market for the authorized Fat Boy video and single, this factor as well weighs in favor of New Line and against a finding of fair use.

The Second Circuit reached the same result in a case closely analogous to the

---

10. As noted in the irreparable harm section of this decision, defendants' video may also harm the market for Nightmare IV, another derivative work. The Court believes that the video is unlikely to harm Nightmare I because this work, while presently running on pay television and available in video stores, is not currently being promoted by New Line.

instant case. In *MCA, Inc. v. Wilson, supra,* 677 F.2d 180, defendants were accused of utilizing portions of the copyrighted song "Boogie Woogie Bugle Boy" in their show. Defendants composed a song entitled "Cunnilingus Champion of Company C" that was substantially similar to plaintiff's song. In deciding that the defendants were not protected by the parody branch of fair use, the Court distinguished previous cases upholding the parody defense on the ground that the case before it involved competition:

> In the instant case, plaintiffs and defendants were competitors in the entertainment field. Both Bugle Boy and Cunnilingus Champion were performed on the stage. Both were sold as recordings. Both were sold in printed copies. Testimony, accepted as credible by the trial court, indicated that Cunnilingus Champion was made to sound like Bugle Boy to create publicity. ... This state of facts is a far cry [from previous cases in which the parody defense was upheld].

*Id.* at 185. Concluding that Cunnilingus Champion was not a parody of Bugle Boy, the Court stated:

> We are not prepared to hold that a commercial composer can plagiarize a competitor's copyrighted song, substitute dirty lyrics of his own, perform it for commercial gain, and then escape liability by calling the end result a parody or satire on the mores of society. Such a holding would be an open-ended invitation to musical plagiarism. We conclude that defendants did not make fair use of plaintiff's song.

*Id.* Similarly, in *D.C. Comics, Inc. v. Unlimited Monkey Business,* 598 F.Supp. 110 (N.D.Ga.1984), the Court focused on the issue of competition in the fair use analysis. In *D.C. Comics,* the holder of the copyrights to "Superman" and "Wonder Woman" brought suit against a singing telegram franchiser and franchisee on the ground that the defendants' skits featuring "Super Stud" and "Wonder Wench" violated plaintiff's copyrights. In rejecting the parody defense and finding that defendants' use was not fair, the Court found that defendants' business infringed on plaintiff's potential market:

> Plaintiff and defendants conduct similar business, notwithstanding the different sizes of their enterprises. Plaintiff engages in licensing and the selling of entertainment. Defendants engage in franchising and the selling of entertainment.... There is a clear potential market for genuine SUPERMAN singing telegrams ... and plaintiff has the ability to exploit that market. Whether or not plaintiff now exploits that market, the effect of defendants' practices upon plaintiff's potential market is clear: they satisfy demand, at least in part, and create competition for plaintiff as a potential entrant.

*Id.* at 118. *See also Metro–Goldwyn–Mayer, Inc. v. Showcase Atlanta Cooperative Productions, Inc., supra,* 479 F.Supp. at 361 (defendant's play "Scarlett Fever" could harm a potential market for stage version of plaintiff's book "Gone with the Wind").

The Court finds *Elsmere Music, Inc. v. National Broadcasting Company, supra,* 623 F.2d 252, a case strongly relied upon by Zomba, to be easily distinguishable. In *Elsmere,* defendant appropriated the advertising jingle "I Love New York" by performing a comedy sketch on Saturday Night Live that lasted 18 seconds in which "I Love Sodom" was sung to the same melody. Although the court found that defendant had appropriated the heart of plaintiff's jingle, the court held that the copying fell under the parody exception to fair use. Crucial to the court's decision was the finding that defendant's use did not interfere with the value of the copyrighted work:

> The song has not affected the value of the copyrighted work. Neither has it had—nor could it have—the "effect of fulfilling the demand for the original." ... Just as imitation may be the sincerest form of flattery, parody is an acknowledgement of the importance of the thing parodied. In short, the defendant's version of the jingle has not in the least competed with or detracted from plaintiff's work.

*Elsmere Music, Inc. v. National Broadcasting Company, Inc., supra,* 482 F.Supp. at 745.

Unlike *Elsmere* and similar to *MCA, Inc., D.C. Comics,* and *Metro–Goldwyn–Mayer, Inc.,* the instant action involves a situation where defendants' work and the song it promotes directly competes with a derivative work produced by plaintiffs. Under these facts, particularly when combined with the other factors discussed above, the Court believes that the parody defense is inapplicable.

D. Propriety of the Defendants' Conduct

The Court's conclusion is also bolstered by examining the propriety of Zomba's conduct in this case. The Second Circuit has indicated that the Court may also properly consider whether the copying was "done in good faith or with evasive motive." *MCA, Inc. v. Wilson, supra,* 677 F.2d at 183. The Supreme Court has noted that fair use presupposes conduct amounting to good faith and fair dealing. *Harper & Row, Publishers, Inc. v. Nation Enterprises, supra,* 471 U.S. at 562, 105 S.Ct. at 2231. In the Court's view, the testimony indicated that Zomba's use of the copyrighted material was not done in good faith. The undisputed facts indicate that New Line and Zomba actively negotiated with respect to a music video about Freddy Krueger. Tr. at 34–37. The testimony also established that New Line decided that the deal presented by the Fat Boys was financially superior to the proposal presented by Zomba. Tr. at 39. There is no dispute that Zomba was informed throughout its negotiations with New Line that New Line was also considering doing a rap video with the Fat Boys. The record also clearly reflects the fact that Zomba was well aware that New Line had entered into a deal with the Fat Boys to do a music video about Freddy when Zomba produced their own Freddy video. Tr. at 123.

Thus, the Court believes that Zomba's conduct was willful and done to directly compete with the music video New Line was producing about Freddy. Tr. at 124. While Zomba claims that the D.J. Jazzy Jeff music video was always intended to be a parody, the testimony elicited at the hearing indicated that the term "parody" was only applied to the work after an awareness of the possibility of litigation. Tr. at 35, 105. Under the circumstances, the Court believes that Zomba's making the unauthorized rap video of Freddy with full knowledge that New Line had entered into a contract with another to make an authorized rap video constitutes bad faith.[11]

As articulated in its discussion above, the Court believes that plaintiffs have established a likelihood of success on the merits. At the very least, however, plaintiffs have surely raised sufficiently serious questions going to the merits to make them a fair ground for litigation.

III. *Balance of Hardships*

■ The final element required for granting a preliminary injunction is a finding that the balance of hardships tips decidedly in favor of the party seeking the injunctive relief. Based on the affidavits and testimony, the Court concludes that this standard is met, in that the balance of hardships in this case tips decidedly in fa-

11. Although normally being refused permission to make a parody would not be bad faith because parodists, due to the very nature of their work, are seldom able to get permission from those whose works are parodied, *Fisher v. Dees,* 794 F.2d 432, 437 (9th Cir.1986), in this case, New Line's refusal's was not due to a concern over being parodied, but rather due to the fact it had chosen another group to make the rap video. Zomba's decision to make the rap video notwithstanding the fact that it was aware that New Line was making its own video demonstrates bad faith. *See Roy Export Company v. Columbia Broadcasting System,* 503 F.Supp. 1137, 1146 (S.D.N.Y.1980), *aff'd,* 672 F.2d 1095 (2d Cir.1982) (defendants were guilty of bad faith where plaintiffs denied permission to use copyrighted material because they were using it themselves and defendants used material anyway).

In addition, the Court believes that the fact that Zomba sought an opinion of counsel with respect to their Freddy does not necessarily indicate good faith because counsel was apparently not asked to consider the issue of whether the planned video or music infringed the Nightmare series but only whether the Freddy character (which Zomba apparently told the law firm was called "Teddy") was infringing.

vor of New Line. Of significance to the Court's decision is that this month marks the premiere of Nightmare IV. This premiere is being accompanied by a massive advertising and promotional campaign, including the release of the Fat Boys video. Tr. at 13. It is in this month that many individuals will make their decision whether Nightmare IV is a film that they are interested in viewing. Thus, the telecast of the lower quality D.J. Jazzy Jeff video with the somewhat silly and less frightening Freddy could dissuade an unspecified number of individuals from seeing the film.

Moreover, the Court believes that Zomba will not be significantly harmed if they are forced to wait a few months before being able to release their music video. The Court has every intention of having this matter tried without significant delay and will place the parties on an expedited discovery and pretrial order track. Although Zomba might be financially better off if they were permitted to release the music video now and thereby obtain the benefits of New Line's massive promotional campaign, the Court believes that Zomba is not entitled to this benefit, particularly because it would result in unjust enrichment of Zomba at New Line's expense.

Finally, a failure to grant an injunction now will essentially be denying New Line ultimate relief, because once the D.J. Jazzy Jeff music video is released on MTV the injury to Nightmare IV and to the sale of "Are You Ready for Freddy?" will be irreparable. On the other hand, a slight delay in the release of the D.J. Jazzy Jeff music video will not result in significant harm to Zomba.

## CONCLUSION

Inasmuch as New Line has adequately demonstrated irreparable injury, that the case presents sufficiently serious questions going to the merits to make them a fair ground for litigation, and that the balance of hardship is on its side, New Line's motion for a preliminary injunction is granted.[12] Zomba is enjoined from man-

ufacturing, advertising, distributing, selling or releasing for public broadcast, telecast or other exhibition, the music video entitled "A Nightmare on My Street," performed by D.J. Jazzy Jeff, during the pendency of this action. The parties are directed to complete discovery by September 30, 1988 and file a joint pretrial order by October 21, 1988.

Settle preliminary injunction on notice.

---

12. Having granted New Line's motion for a preliminary injunction under the copyright law, the Court need not consider New Line's arguments for an injunction under the Lanham Act.