972 F.2d 1429
 61 USLW 2116, 1992 Copr.L.Dec. P 26,966,
23 U.S.P.Q.2d 1817
 ACUFF-ROSE MUSIC, INC., Plaintiff-Appellant,
v.
Luther R. CAMPBELL, a/k/a Luke Skyywalker; Christopher
Wongwon, a/k/a Fresh Kid Ice; Mark Ross, a/k/a Brother
Marquis; David Hobbs, a/k/a Mr. Mixx; professionally known
as 2 Live Crew; Luke Skyywalker Records, Defendants-Appellees.
 No. 91-6225.
 United States Court of Appeals,
Sixth Circuit.
 Argued May 15, 1992.
Decided Aug. 17, 1992.
Rehearing and Rehearing En Banc Denied Oct. 26, 1992.
 
 1
 E. Andrew Norwood (briefed), Francis J. Del Casino (briefed), R. Eddie Wayland (argued and briefed), Nora T. Cannon (briefed), King & Ballow, Nashville, Tenn., for plaintiff-appellant.
 
 
 2
 Alan Mark Turk (argued and briefed), Sanford R. Ross, Nashville, Tenn., for defendants-appellees.
 
 
 3
 Before: NELSON and NORRIS, Circuit Judges; and JOINER, Senior District Judge.*
 
 
 4
 JOINER, Senior District Judge.
 
 
 5
 In this copyright case, plaintiff appeals summary judgment granted to defendants. The district court held that defendants' use of a song owned by plaintiff was a parody and therefore constituted a fair use of copyrighted material under section 107 of the Copyright Act, 17 U.S.C. § 101 et seq.
 
 
 6
 The 2 Live Crew, a rap music group, released for commercial distribution a version of Acuff-Rose Music's copyrighted song, "Oh, Pretty Woman." Acuff-Rose sued The 2 Live Crew, its individual members and its record company for copyright infringement and alleged pendent state law claims of interference with business relations and interference with prospective business advantage. Defendants filed a motion for dismissal, which was treated as a motion for summary judgment. The district court granted summary judgment, holding that The 2 Live Crew had created a parody and that the parody was a non-infringing "fair use" of the song as defined by section 107 of the 1976 Copyright Act. 17 U.S.C. § 107. We reverse.
 
 I.
 
 7
 "Oh, Pretty Woman" was written and recorded by Roy Orbison and William Dees in 1964. Rights to the song were assigned to Acuff-Rose that same year, and Acuff-Rose registered for copyright protection. The song has become a pop music standard, and Acuff-Rose has realized substantial income from the licensing of "cover" recordings and other derivative works.
 
 
 8
 Luther Campbell, lead vocalist and song writer of The 2 Live Crew (2 Live Crew), wrote a version of "Oh, Pretty Woman" in May 1989, which he entitled "Pretty Woman." By affidavit, Campbell stated that he had intended to create a parody as an attempt "through comical lyrics, to satirize the original work...." In June 1989, Campbell's company, Luke Records (then doing business as Skyywalker Records), released "Pretty Woman" as one of ten tracks on a collection entitled "As Clean As They Wanna Be." The credits on the album[1] recognize Orbison and Dees as the writers of "Pretty Woman," and Acuff-Rose as publisher of the song.
 
 
 9
 On July 5, 1989, following release of the album, Linda Fine, general manager of Luke Records, wrote a letter to Gerald Tiefer of Opryland Music Group (of which Acuff-Rose is a part) to "inform [Tiefer] of 'Two Live Crew's' desire to do a parody" of "Oh, Pretty Woman."[2] Fine stressed that a parody was intended and that the popularity of 2 Live Crew ensured substantial sales:
 
 
 10
 At the time of this writing the Group has a cut on the Billboard Rap Chart. I have enclosed a copy of the lyrics, so that you may see their satirical parody, very similar in vain [sic] to what Weird Al Yankovic and other satirical artists are doing.
 
 
 11
 We intend that all credits (writer & publisher) show your complete ownership of the song, and of course we intend to pay statutory rates.
 
 
 12
 Kindly keep in mind that we present this to you in a humorous sense and in no way should this be construed as anything but a novelty record that will be heard by hundreds of thousands of new listeners in their homes.
 
 
 13
 Fine included a cassette tape of 2 Live Crew's version of the song and a lyric sheet for Tiefer to consider.
 
 
 14
 Tiefer responded tersely: "I am aware of the success enjoyed by 'The 2 Live Crews', but I must inform you that we cannot permit the use of a parody of 'Oh, Pretty Woman.' " This refusal to grant a license did not dissuade 2 Live Crew from continuing to sell "As Clean As They Wanna Be."
 
 
 15
 Acuff-Rose brought suit in June 1990 and defendants responded by filing a motion to dismiss, accompanied by affidavits, and sought to deposit $13,867.56. This amount was apparently calculated after reference to statutory royalty rates established by the Copyright Act, and reflected defendants' understanding of what was owed to Acuff-Rose for use of the copyrighted song. The district court ordered the funds deposited with the Clerk of Court.[3] Acuff-Rose responded with affidavits, which the district court relied upon when granting summary judgment.
 
 
 16
 Among the affidavits presented, defendants presented that of Oscar Brand.[4] Brand, who has himself recorded a number of songs which he terms "parodies," stated his opinion that "both the words and the music of the 2 Live Crew performance are classic parodies." Brand dissected the two songs and found substantial similarities of musical structure between them. The 2 Live Crew version has the same 4/4 drum beat as the original and includes a "very recognizable 'bass riff,' " which "is repeated eight times...." However, the 2 Live Crew version diverges from the original by following the recognizable riff with "an atypical scraper--a Latin musical device, quite antithetic to the Orbison musical styling." Further, in the 2 Live Crew version, the lead vocalist sings (or raps) "in the key of B major, which, performed against the A major chorus, gives the song a comic aspect."
 
 
 17
 Lyrically, Brand found "Pretty Woman" to be consistent with a long tradition in the United States of making social commentary through music. African-American rap music, Brand stated, uses parody as a form of protest, and often substitutes new words to "make fun of the 'white-bread' originals and the establishment...." In "Pretty Woman," Brand concluded, "this anti-establishment singing group is trying to show how bland and banal the Orbison song seems to them. It's just one of many examples of their derisive approach to 'white-centered' popular music."
 
 
 18
 Acuff-Rose presented the affidavit of Ph.D. musicologist Earl V. Speilman. Speilman also examined and compared the two songs and determined that there is "a significant amount of similarity" between them. Speilman identified five specific similarities, including the repetition of the recognizable riff, which "may have actually been sampled or lifted and then incorporated into the recording of 'Pretty Woman' as performed by The 2 Live Crew." Speilman concluded that even a listener without musical training would readily discern that "Pretty Woman" was modelled after "Oh, Pretty Woman."
 
 
 19
 The district court determined that there were no genuine issues of fact material to the question of fair use in dispute, and that the case was therefore suitable for summary judgment. Acuff-Rose Music, Inc. v. Campbell, 754 F.Supp. 1150, 1153 (M.D.Tenn.1991). The court then analyzed the factors by which an alleged infringing use is tested for fairness under section 107 of the Act. Id. at 1154-59.[5]
 
 
 20
 Following the district court's determination that "Pretty Woman" was a parody, Acuff-Rose filed motions to distribute the funds deposited by 2 Live Crew with the Clerk of Court, and sought reconsideration of the fair use determination by introducing additional evidence on the question of the impact of the parody upon the market value of the copyrighted original.[6] Based upon its determination of fair use, the district court granted summary judgment and ordered the funds returned to 2 Live Crew.
 
 II.
 
 21
 We review the district court's grant of summary judgment de novo. EEOC v. University of Detroit, 904 F.2d 331, 334 (6th Cir.1990). Summary judgment is appropriate if the non-moving party fails to establish a genuine issue of material fact on an element essential to its case and on which it would bear the burden of proof at trial. Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). In making that determination, we view the evidence in the record in the light most favorable to the non-moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202 (1986).
 
 
 22
 These general principles apply to the question of fair use, Maxtone-Graham v. Burtchaell, 803 F.2d 1253, 1257-58 (2d Cir.1986), cert. denied, 481 U.S. 1059, 107 S.Ct. 2201, 95 L.Ed.2d 856 (1987), which is a mixed question of law and fact. Mathews Conveyor Co. v. Palmer Bee Co., 135 F.2d 73, 85 (6th Cir.1943); Harper & Row Publishers v. Nation Enter., 471 U.S. 539, 560, 105 S.Ct. 2218, 2230, 85 L.Ed.2d 588 (1985). In reviewing the district court's determination of fair use, when that court has found facts sufficient to evaluate each of the factors enumerated in section 107 of the Copyright Act, we " 'need not remand for further factfinding ... [but] may conclude as a matter of law that [the challenged use] do[es] not qualify as a fair use of the copyrighted work.' " Harper & Row, 471 U.S. at 560, 105 S.Ct. at 2230 (quoting Pacific & S. Co. v. Duncan, 744 F.2d 1490, 1495 (11th Cir.1984)). Our review of the record shows that no material facts are in dispute. The parties dispute the ultimate conclusions to be drawn from the facts. These judgments are legal in nature.
 
 III.
 
 23
 Section 102(a) of the Copyright Act, adopted under the express authority of Art. I, Section 8 of the United States Constitution granting Congress the power to give authors exclusive rights to their writings, protects "musical works, including any accompanying words." 17 U.S.C. § 102(a)(2). Section 106 of the Act grants to the copyright holder a variety of exclusive rights in the copyrighted work, including the right to "reproduce the copyrighted work in copies or phonorecords," and to "prepare derivative works based upon the copyrighted work." 17 U.S.C. § 106(1) and (2). The words and music to plaintiff's song "Oh Pretty Woman" are subject to these protections. However, plaintiff's exclusive rights are also subject to the provisions of sections 107 through 118 of the Act, which create exemptions and limitations on the owner's rights.
 
 Section 107 of the Copyright Act states:
 
 24
 Notwithstanding the provisions of sections 106 and 106A, the fair use of a copyrighted work, including such use by reproduction in copies or phonorecords or by any other means specified by that section, for purposes such as criticism, comment, news reporting, teaching (including multiple copies for classroom use), scholarship, or research, is not an infringement of copyright. In determining whether the use made of a work in any particular case is a fair use the factors to be considered shall include--
 
 
 25
 (1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;
 
 
 26
 (2) the nature of the copyrighted work;
 
 
 27
 (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and
 
 
 28
 (4) the effect of the use upon the potential market for or value of the copyrighted work.
 
 
 29
 17 U.S.C. § 107. In this case 2 Live Crew defends against a charge of copyright infringement by arguing that "Pretty Woman" falls within the exceptions spelled out in section 107.
 
 
 30
 In determining the scope and extent of the exceptions and limitations to copyright protection carved out by section 107, it is important to focus on the plain language of that section and the directions implicit in its form. Section 107 takes from a copyright owner the exclusive rights to his work insofar as a derivative, or allegedly infringing work, is a "fair use" of the copyrighted work. Traditionally, fair use is defined as " 'a privilege in others than the owner of the copyright to use the copyrighted material in a reasonable manner without his consent.' " Harper & Row, 471 U.S. at 549, 105 S.Ct. at 2224 (quoting H. Ball, Law of Copyright and Literary Property, 260 (1944)). Fair use is an "equitable rule of reason," Sony Corp. of America v. Universal City Studios, Inc., 464 U.S. 417, 448, 104 S.Ct. 774, 792, 78 L.Ed.2d 574 (1984), which is used in order to "avoid rigid application of the copyright statute when, on occasion, it would stifle the very creativity which that law is designed to foster." Stewart v. Abend, 495 U.S. 207, 236, 110 S.Ct. 1750, 1768, 109 L.Ed.2d 184 (1990) (quoting Iowa State Univ. Research Found., Inc. v. American Broadcasting Cos., 621 F.2d 57, 60 (2d Cir.1980)). Fair use is the only exception to a copyright holder's exclusive rights in his work, but section 107 explains that the overarching concept of fair use embraces use of a copyrighted work for the purpose of "criticism, comment, news reporting, teaching, scholarship, or research."
 
 
 31
 As the jurisprudence of section 107 has developed, the courts have found that the section's recognition of "comment" and "criticism" as species of fair use also, by practical extension of those terms, includes the use of a copyrighted work (or a portion thereof) as a parody or satire of that work. Rogers v. Koons, 960 F.2d 301, 309 (2d Cir.1992). Indeed, the fair use formulation found in section 107 is a reflection of Congress's intent to codify the common law fair use doctrine,[7] which has long included parody. Harper & Row, 471 U.S. at 549, 105 S.Ct. at 2224; see also Bloom & Hamlin v. Nixon, 125 F. 977 (C.C.E.D.Pa.1903) (a parody fair use involving vaudeville impersonations). Therefore, it is understandable that both the parties and the district court focus on parody in their analyses of fair use. However, because the text of section 107 lists specific fair uses, we find that the term parody must be either subsumed within the statutory terms "criticism" or "comment," or be an entirely separate category of exception.
 
 
 32
 Unfortunately, the terminology of the fair use analysis has evolved in such a way that the popular definition of parody and the statutory definition of parody as a form of criticism have become somewhat confused. Popularly, the term parody may be described as "when one artist, for comic effect or social commentary, closely imitates the style of another artist and in so doing creates a new artwork that makes ridiculous the style and expression of the original." Rogers, 960 F.2d at 309-10. This popular definition has been used on occasion as a synonym for that which is necessary to create an exception to the exclusive rights in a copyrighted work. This use, we find, creates confusion and should be avoided. Much of entertainment involves parodies in the popular sense, but section 107 does not direct the courts to conclude that all such parodies are fair uses. For the purposes of this opinion, we will assume, as found by the district court, that 2 Live Crew's song is a parody of Acuff-Rose's copyrighted song, and proceed to determine whether the calculus of section 107 results in a determination of fair use. That determination requires careful application of the four statutory factors. Harper & Row, 471 U.S. at 549, 105 S.Ct. at 2224; 3 M. Nimmer, Nimmer on Copyright, § 13.05[A] at 13-82.1. Although the question of fair use in the context of musical works is one of first impression in this circuit, we do not write on a clean slate.
 
 Purpose and Character of Use
 
 33
 We look first to the purpose and character of the use of Acuff-Rose's song by 2 Live Crew. We accept the district court's conclusion that the purpose of the use was to parody the original.[8] We consider the character of the use separately. The use of a copyrighted work primarily for commercial purposes has been held by the Supreme Court to be presumptively unfair. Sony Corp., 464 U.S. 417, 449, 104 S.Ct. 774, 792, 78 L.Ed.2d 574 (1984). "While commercial motivation and fair use can exist side by side, the court may consider whether the alleged infringing use was primarily for public benefit or for private commercial gain." MCA, Inc. v. Wilson, 677 F.2d 180, 182 (2d Cir.1981). The Supreme Court explained that "[t]he crux of the profit/nonprofit distinction is not whether the sole motive of the use is monetary gain, but whether the user stands to profit from exploitation of the copyrighted material without paying the customary price." Harper & Row, 471 U.S. at 562, 105 S.Ct. at 2231.
 
 
 34
 In the instant case, the district court found, and we agree, that "2 Live Crew's song is included on a commercially distributed album sold for the purpose of making a profit," and that "2 Live Crew's primary goal in releasing 'As Clean As They Wanna Be' is to sell its music...." 754 F.Supp. at 1154. However, the district court saw the Supreme Court's holdings in Sony Corp. and Harper & Row regarding the presumptively unfair nature of a commercial purpose as "merely 'tend[ing] to weigh against a finding of fair use.' " Id. (quoting Harper & Row, 471 U.S. at 562, 105 S.Ct. at 2231). We agree that commercial purpose is not itself controlling on the issue of fair use, but find that the district court placed insufficient emphasis on the command of Harper & Row, wherein the Supreme Court expressly reaffirmed its earlier holding that " '[E]very commercial use of copyrighted material is presumptively an unfair exploitation of the monopoly privilege that belongs to the owner of the copyright.' " 471 U.S. at 562, 105 S.Ct. at 2231 (quoting Sony Corp., 464 U.S. at 451, 104 S.Ct. at 792). Therefore, in analyzing the purpose and character of 2 Live Crew's use of the copyrighted song, the facts in the record require that we start from the position that the use is unfair. We are asked to then consider whether 2 Live Crew met its burden to rebut the presumption by a defense, we note, requiring the court to be convinced that the "parody does not unfairly diminish the economic value of the original." Fisher v. Dees, 794 F.2d 432, 437 (9th Cir.1986).
 
 
 35
 Although in this case we do not set aside the district court's conclusion that 2 Live Crew's song is a criticism in the nature of a parody in the popular sense, we nevertheless find that the district court erred in the process of determining that the criticism constituted a fair use of the copyrighted work. We find that the admittedly commercial nature of the derivative work--the purpose of the work being no less important than its character in the Act's formulation--requires the conclusion that the first factor weighs against a finding of fair use. Sony Corp., 464 U.S. at 449, 104 S.Ct. at 792.
 
 Nature of Copyrighted Work
 
 36
 The district court found that this factor weighed against a determination of fair use, and we agree. Acuff-Rose, 754 F.Supp. at 1155-56. As a general rule, creative works--literary works of fiction or artistic works--are afforded greater protection from the fair use determination than are works of fact. Harper & Row, 471 U.S. at 563, 105 S.Ct. at 2232; New Era Publications, Int'l v. Carol Publishing Group, 904 F.2d 152, 157 (2d Cir.), cert. denied, --- U.S. ----, 111 S.Ct. 297, 112 L.Ed.2d 251 (1990). The status of "Oh, Pretty Woman" as a creative work is not contested. In determining whether this factor should weigh in favor of the copyright holder we also ask whether the work "represented a substantial investment of time and labor made in anticipation of financial return." MCA, Inc., 677 F.2d at 182. The record amply supports a finding in favor of Acuff-Rose on this factor.
 
 Portion Used
 
 37
 The third factor we consider is the amount and substantiality of the portion of the copyrighted work used in the derivative work in relation to the copyrighted work as a whole. As applied to alleged parodies, this factor has historically turned on analysis of the "conjure up" test. Walt Disney Prods. v. Air Pirates, 581 F.2d 751, 757 (9th Cir.1978), cert. denied sub nom., O'Neill v. Walt Disney Prods., 439 U.S. 1132, 99 S.Ct. 1054, 59 L.Ed.2d 94 (1979). The test asks "whether the parodist has appropriated a greater amount of the original work than is necessary to 'recall or conjure up' the object of his satire." Id. The test describes a continuum of use, and not only scrutinizes the extent of the taking, but the qualitative nature of that taking. Harper & Row, 471 U.S. at 565, 105 S.Ct. at 2233. A de minimis use, one that is meager and fragmentary, by definition fails to conjure up the original and does not constitute an infringement. Elsmere, 482 F.Supp. at 744. The 2 Live Crew, appropriately, does not attempt to characterize its use of the copyrighted work as de minimis. Uses which depart from the de minimis level may nevertheless be fair uses, but at some point on the continuum this factor militates against a finding of fair use. Air Pirates, 581 F.2d at 757. Parodies are generally allowed to use more of the copyrighted work and still fall within the rubric of fair use than are other types of copying:
 
 
 38
 [T]he concept of 'conjuring up' an original came into the copyright law not as a limitation on how much of an original may be used, but as a recognition that a parody frequently needs to be more than a fleeting evocation of an original in order to make its humorous point. A parody is entitled at least to 'conjure up' the original.
 
 
 39
 Elsmere, 623 F.2d at 253, n. 1 (citation omitted).
 
 
 40
 The district court, having found that 2 Live Crew created a parody in the popular sense, applied the conjure up test. The amount of the original work which is appropriated is a factual issue, but the question whether the taking is excessive under the circumstances is one of law. Fisher, 794 F.2d at 438, n. 4.
 
 
 41
 The district court, operating on the assumption that "Pretty Woman" is a parody, concluded: "In view of the fact that the medium is a song, its purpose is parody, and the relative brevity of the copying, it appropriates no more from the original than is necessary to accomplish reasonably its parodic purpose." Acuff-Rose, 754 F.Supp. at 1157. Clearly, the court was using the term parody in its popular sense. While it may not be inappropriate to find that no more was taken than necessary, the copying was qualitatively substantial. Both of defendants' affiants stated that 2 Live Crew's version tracks the music and meter of the original. These opinions were intended to demonstrate that the new song is a parody. However, these opinions point out the substantiality of copying. Near verbatim taking of the music and meter of a copyrighted work without the creation of a parody is excessive taking. See MCA, Inc., 677 F.2d at 183-85. Most importantly, defendants' affiants stated that the song is built upon the recognizable bass or guitar riff of the original by repeating that riff eight times. Acuff-Rose's musicologist stated that the riff was probably sampled from the original, that is, simply recorded verbatim and then mixed with 2 Live Crew's additions. "[T]he fact that a substantial portion of the infringing work was copied verbatim is evidence of the qualitative value of the copied material, both to the originator and to the plagiarist who seeks to profit from marketing someone else's copyrighted expression." Harper & Row, 471 U.S. at 565, 105 S.Ct. at 2233. The qualitative degree of the copying is even more critical than the quantitative, and we ask what degree of the essence of the original is copied in relation to its whole. See Salinger v. Random House, Inc., 811 F.2d 90, 98 (2d Cir.), reh'g denied, 818 F.2d 252, cert. denied, 484 U.S. 890, 108 S.Ct. 213, 98 L.Ed.2d 177 (1987). We conclude that taking the heart of the original and making it the heart of a new work was to purloin a substantial portion of the essence of the original. The facts as developed under this factor, "the amount and substantiality of the portion used in relation to the copyrighted work as a whole" cannot be used in any way to support a finding of fair use.
 
 Effect on Potential Market
 
 42
 This factor has been characterized as "undoubtedly the single most important element of fair use." Harper & Row, 471 U.S. at 566, 105 S.Ct. at 2233; see also Stewart, 495 U.S. at 238, 110 S.Ct. at 1769. This factor requires that a balance be struck "between the benefit gained by the copyright owner when the copying is found an unfair use and the benefit gained by the public when the use is held to be fair." Rogers, 960 F.2d at 311. To demonstrate that the balance weighs in favor of a finding of no fair use:
 
 
 43
 Actual present harm need not be shown; such a requirement would leave the copyright holder with no defense against predictable damage. Nor is it necessary to show with certainty that future harm will result. What is necessary is a showing by a preponderance of the evidence that some meaningful likelihood of future harm exists. If the intended use is for commercial gain, that likelihood may be presumed. But if it is for a noncommercial purpose, the likelihood must be demonstrated.
 
 
 44
 Sony Corp., 464 U.S. at 451, 104 S.Ct. at 793 (emphasis in original). The focus is on potential harm, and the "inquiry must take account not only of harm to the original but also of harm to the market for derivative works." Harper & Row, 471 U.S. at 568, 105 S.Ct. at 2234.
 
 
 45
 In the instant case, the use of the copyrighted work is wholly commercial, so that we presume that a likelihood of future harm to Acuff-Rose exists. See Rogers, 960 F.2d at 312 (the court holding that "there is simply nothing in the record to support a view that [defendant] produced [the derivative art work] for anything other than sale as high-priced art. Hence, the likelihood of future harm to [plaintiff's] photograph is presumed, and plaintiff's market for his work has been prejudiced").
 
 
 46
 Having determined that 2 Live Crew created a parody, the district court refused to indulge the presumption and concluded that "it is extremely unlikely that 2 Live Crew's song could adversely affect the market for the original" because the "intended audience for the two songs is entirely different." Acuff-Rose, 754 F.Supp. at 1158. In reaching this conclusion, the district court largely relied on the affidavit of Krasilovsky who stated, in part: "I cannot see how it [the new work] can affect the sales or popularity of the Orbison song, except to stimulate interest in the original." Id. Although we have already determined that harm for purposes of the fair use analysis has been established by the presumption attaching to commercial uses, we note that inquiry under the fourth statutory factor not only considers harm to the market for the original but harm to the market for derivative works as well. Id. This formulation was arrived at by Professor Nimmer, who provided an example relied upon by the Rogers court: "[A] movie adaptation is made of a book. Even though the movie may boost book sales, it is an unfair use because of the effect on the potential sale of adaptation rights." Rogers, 960 F.2d at 312 (citing 3 Nimmer, § 13.05[B]. Krasilovsky's statement is irrelevant as to the fourth statutory factor. The record on this factor does not support a finding of fair use.
 
 Conclusion
 
 47
 Three of the factors set out in the statute weigh against a finding of fair use. One is, at best, neutral. In dealing with uses popularly termed parodies, the factors involving the commercial nature of the use and the damage to the defendant are of particular significance. It is likely, for example, that an identical use of the copyrighted work in this case at a private gathering on a not-for-profit basis would be a fair use. It is the blatantly commercial purpose of the derivative work that prevents this parody from being a fair use.
 
 
 48
 We conclude that the district court erred in granting summary judgment to defendants. The four factors set forth in section 107 of the Act support the conclusion that 2 Live Crew's use of Acuff-Rose's copyrighted song was not a fair use. We REVERSE and REMAND for proceedings consistent with this opinion.
 
 
 49
 DAVID A. NELSON, Circuit Judge, dissenting.
 
 
 50
 A Second Circuit panel that included both of the cousins Hand once called the "fair use" issue "the most troublesome in the whole law of copyright." Dellar v. Samuel Goldwyn, Inc., 104 F.2d 661, 662 (2d Cir.1939). It has been said, indeed, that the fair use doctrine "is so flexible as virtually to defy definition." Time, Inc. v. Bernard Geis Assocs., 293 F.Supp. 130, 144 (S.D.N.Y.1968).
 
 
 51
 Perhaps the most troublesome fair use issue of all is the question of whether a particular parody constitutes fair use of a copyrighted original. The parody cases appear to be in hopeless conflict. Compare, for example, Loew's, Inc. v. Columbia Broadcasting System, 131 F.Supp. 165 (S.D.Cal.1955), aff'd sub nom. Benny v. Loew's, Inc., 239 F.2d 532 (9th Cir.1956), aff'd by an equally divided court, 356 U.S. 43, 78 S.Ct. 667, 2 L.Ed.2d 583 (1958) (Jack Benny's parody of the motion picture "Gaslight" held not to be fair use of the original), with Berlin v. E.C. Publications, Inc., 329 F.2d 541 (2d Cir.), cert. denied, 379 U.S. 822, 85 S.Ct. 46, 13 L.Ed.2d 33 (1964) (Mad Magazine parodies of Irving Berlin songs held to be fair use).[1] Cf. Columbia Pictures Corp. v. National Broadcasting Co., 137 F.Supp. 348 (S.D.Cal.1955), where the same district judge who rejected the fair use defense for Jack Benny's parody of "Gaslight" accepted the defense for a Sid Caesar parody of "From Here to Eternity." In sum, whether a particular parody is entitled to the protection of the fair use doctrine is a question likely to be dealt with by lower courts in much the same way that the Supreme Court deals with more than a few questions of constitutional law; we think we know fair use when we see it, even if we cannot do a very good job of relating what we see (or do not see) to the governing text.
 
 
 52
 The text that is pertinent here is statutory, not constitutional.[2] Where parody is concerned, however, the guidance provided by the statute is at least as Delphic as that sometimes provided by the Constitution. The Copyright Act says that "the fair use of a copyrighted work ... for purposes such as criticism, comment ... scholarship or research, is not an infringement of copyright." 17 U.S.C. § 107 (emphasis supplied). (The statute itself tells us that the words "such as" mean what they say and "are illustrative and not limitative." 17 U.S.C. § 101.) The statute then goes on to list four factors that shall be "include[d]" among the factors considered by a court in determining a question of fair use: "In determining whether the use made of a work in any particular case is a fair use the factors to be considered shall include [the four factors.]" Section 107 (emphasis supplied). Here again, the list provided by Congress is "nonexclusive," to borrow the term used in Harper & Row, Publishers, Inc. v. Nation Enterprises, 471 U.S. 539, 549, 105 S.Ct. 2218, 2224, 85 L.Ed.2d 588 (1985); the court is free to consider any other factors that may be relevant.
 
 
 53
 Where we are dealing with parody, as I shall suggest, unenumerated factors may have no less relevance than the four set forth in the statute--and the statutory factors are likely to have a somewhat different impact on our deliberations than they would in a non-parody situation. Before turning to these matters, however, I think it would be helpful to consider what it is we are talking about when we speak of "parody."
 
 
 54
 The etymology of the word has direct relevance to this case. The term comes from the Greek parodeia, meaning "a song sung alongside another."[3] The musical parody is thus the very archetype of the genre.
 
 
 55
 One of the best definitions I have come across is the following, which appears in a prize-winning student essay:"A parody is a work that transforms all or a significant part of an original work of authorship into a derivative work by distorting it or closely imitating it, for comic [or, I would add, for satiric] effect, in a manner such that both the original work of authorship and the independent effort of the parodist are recognizable." Clemmons, "Author v. Parodist: Striking a Compromise," ASCAP Copyright Law Symposium No. 33 (1987) at 101.[4]
 
 
 56
 Some authorities go on to suggest that if the derivative work is to be treated as true parody, it must do more than achieve a comic effect: "It must also make some critical comment or statement about the original work which reflects the original perspective of the parodist--thereby giving the parody social value beyond its entertainment function." Metro-Goldwyn-Mayer v. Showcase Atlanta Cooperative Productions, Inc., 479 F.Supp. 351, 357 (N.D.Ga.1979); New Line Cinema Corp. v. Bertlesman Music Group, Inc., 693 F.Supp. 1517, 1525 (S.D.N.Y.1988). See also Faaland, "Parody and Fair Use: The Critical Question," 57 Wash.L.Rev. 163 (1981); Bisceglia, "Parody and Copyright Protection: Turning the Balancing Act into a Juggling Act," ASCAP Copyright Law Symposium No. 34 (1987). But whether or not a derivative work must "criticize" the original, I am not sure that I understand the reservations my colleagues on the panel have expressed in this case about accepting the district court's conclusion that 2 Live Crew's "Pretty Woman" is in fact a parody of the Acuff-Rose original. Under anyone's definition, it seems to me, the 2 Live Crew song is a quintessential parody.
 
 
 57
 The Second Circuit faced a similar definitional question in Berlin v. E.C. Publications, Inc., 329 F.2d 541 (2d Cir.), cert. denied, 379 U.S. 822, 85 S.Ct. 46, 13 L.Ed.2d 33 (1964). One of the Irving Berlin pieces on which the Mad Magazine people had worked their peculiar magic was the song "A Pretty Girl is Like a Melody." (Messrs. Orbison and Dees are obviously not the first tunesmiths to have turned their attention to a comely female.) The defendants, in the words of the court,
 
 
 58
 "transformed the plaintiffs' 'A Pretty Girl is Like a Melody,' into 'Louella Schwartz Describes Her Malady'; what was originally a tribute to feminine beauty became a burlesque of a feminine hypochondriac troubled with sleeplessness and a propensity to tell the world of her plight." Id. at 543.
 
 
 59
 This was "parody," the Second Circuit said--and it was parody that constituted fair use of Irving Berlin's original work:
 
 
 60
 "For, as a general proposition, we believe that parody and satire are deserving of substantial freedom--both as entertainment and as a form of social and literary criticism. As the readers of Cervantes' 'Don Quixote' and Swift's 'Gulliver's Travels,' or the parodies of a modern master such as Max Beerbohm well know, many a true word is indeed spoken in jest." Id. at 545.
 
 
 61
 In Fisher v. Dees, 794 F.2d 432 (9th Cir.1986), similarly, the Ninth Circuit had occasion to analyze a pair of songs about women named "Sunny" or "Sonny." The first piece, recorded in the 1950s by Johnny Mathis, was entitled "When Sunny Gets Blue." The second, released in 1985 under the title "When Sonny Sniffs Glue," copied the first six bars (the recognizable main theme) of the original song's 38 bars. The derivative work transformed the original opening lyrics--"When Sunny gets blue, her eyes get gray and cloudy, then the rain begins to fall"--into "When Sonny sniffs glue, her eyes get red and bulgy, then her hair begins to fall." Id. at 434. After listening to tapes of both songs, the Ninth Circuit panel had no difficulty at all in rejecting an argument that "the so-called parody is not actually a parody, or at least is not a parody of the composer's song." Id. at 436. Said the court,
 
 
 62
 "Although we have no illusions of musical expertise, it was clear to us that Dees's version was intended to poke fun at the composers' song, and at Mr. Mathis's rather singular vocal range. We reject the notion that the song was used merely as a vehicle to achieve a comedic objective unrelated to the song, its place and time." Id.
 
 
 63
 Like the Second Circuit panel in Berlin, the Fisher court affirmed a finding that the parody was entitled to fair use protection as a matter of law. Id. at 440.
 
 
 64
 I myself have no more "illusions of musical expertise" than did the members of the court that decided Fisher v. Dees. After listening, however, to Exhibits D and E, the tapes of the two "Pretty Woman" songs, I am satisfied that the 2 Live Crew version both imitates and distorts the original work for comic or satiric effect, and does so in such a way that both the original work and the work of the parodist are readily recognizable. The parody (done in an African-American dialect) was clearly intended to ridicule the white-bread original--and if a higher criticism is necessary to qualify the derivative work as true parody, such criticism is readily discernible.
 
 
 65
 The affidavit of Oscar Brand explains, as Judge Joiner has noted, that "this anti-establishment singing group [2 Live Crew] is trying to show how bland and banal the Orbison song seems to them." The district court accepted Brand's explanation. 754 F.Supp. at 1155. So do I. Whether one likes the original or not--and the maxim "de gustibus non est disputandum " comes to mind here--the original is quite clearly being held up to criticism by 2 Live Crew.
 
 
 66
 Consider the plot, if one may call it that, of the original work. A lonely man with a strangely nasal voice sees a pretty woman (name unknown) walking down the street. The man speculates on whether the woman is lonely too. Apostrophizing her in his mind, he urges her to stop and talk and give him a smile and say she will stay with him and be his that night. The woman walks on by, and the man resigns himself to going home alone. Before he leaves, however, he sees the woman walking back to him. End of story.
 
 
 67
 This little vignette is intended, I think, to be sort of sweet. While it is certainly suggestive, it is also, by the standards of its time, "romantic" rather than indelicate. The singer evokes a sexual theme in his soliloquy, but then leaves the realization of his desire to the listener's imagination.
 
 
 68
 The parody by 2 Live Crew is much more explicit, and it reminds us that sexual congress with nameless streetwalkers is not necessarily the stuff of romance and is not necessarily without its consequences. The singers (there are several) have the same thing on their minds as did the lonely man with the nasal voice, but here there is no hint of wine and roses. The 2 Live Crew singers--randy misogynists, not lonely Sir Lancelots--raucously address a "big hairy woman" and her "bald-headed friend," one or both of whom are urged to "let the boys jump in." One singer chides a woman (the big hairy one, I think) for having cheated on him ("Two timin' woman/You's out with my boy last night"). In the end, this cloud proves to have what the singer sees as a silver lining:
 
 
 69
 "Two timin' woman/That takes a load off my mind Two timin' woman/Now I know the baby ain't mine."
 
 
 70
 This, I should say, is "criticism" with a vengeance--and the thematic relationship to the original is obvious. The relationship between the copyrighted song and the parody is every bit as patent here as was the corresponding relationship between the songs considered by the courts in Elsmere Music, Inc. v. National Broadcasting Co., 482 F.Supp. 741 (S.D.N.Y.1980), aff'd 623 F.2d 252 (2d Cir.1980). That case involved an oft-repeated advertising jingle known as "I Love New York" and a Saturday Night Live take-off entitled "I Love Sodom." The parody was held to constitute a fair use of the original. The statutory factors, in my view, fully support a corresponding result in the instant case.
 
 
 71
 * * * * * *
 
 
 72
 The first of the factors that we must consider is this:
 
 
 73
 "(1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes...."
 
 
 74
 In the case before us, of course, the purpose is parody and the character is commercial. Does the mere fact that the parodists hoped to make money mean that their use of the original work is presumptively unfair? I am by no means convinced that the Supreme Court would so hold--and any such presumption would be readily rebuttable in any event.
 
 
 75
 It is true that in the Betamax case, Sony Corp. v. Universal City Studios, Inc., 464 U.S. 417, 451, 104 S.Ct. 774, 793, 78 L.Ed.2d 574 (1984), the Court made the broad statement that "every commercial use of copyrighted material is presumptively an unfair exploitation of the monopoly privilege that belongs to the owner of the copyright...." It is also true that this statement was quoted with approval in Harper & Row, 471 U.S. at 562, 105 S.Ct. at 2231. But both of those cases involved mechanical copying, literally or figuratively, without alteration of the copied material.
 
 
 76
 There is a difference, obviously, between copying and caricaturizing. By calling into being a new and transformed work, the caricaturist exercises a type of creativity that is foreign to the work of the copyist. And the creative work of the caricaturist is surely more valuable than the reproductive work of the copyist. Thus it has been suggested that the presumption of unfairness in cases of commercial exploitation "is sensible and appropriate only when applied to commercial reproductive uses...." Note, "The Parody Defense to Copyright Infringement: Productive Fair Use After Betamax," 97 Harv.L.Rev. 1395, 1408 (1984).
 
 
 77
 An illustration may help. W.S. Gilbert and Sir Arthur Sullivan created comic operas that are among the most commercially successful of all time. Gilbert and Sullivan certainly cannot be said to have had "nonprofit educational purposes" in mind when they wrote such a work as Princess Ida, one of their minor masterpieces. Princess Ida was, in Gilbert's words, "a respectful operatic perversion" of "The Princess," a lengthy poem by Tennyson. Would the world not be a poorer place if Lord Tennyson could have stilled the voice of W.S. Gilbert merely because Gilbert's purposes included the making of money? For anyone who loves Gilbert and Sullivan--and their number is legion--the question answers itself.
 
 
 78
 Similarly, I think, the world would be the poorer if the holders of the copyright on "I Love New York" had been allowed to block the Saturday Night Live rendition of "I Love Sodom." "[I]n today's world of often unrelieved solemnity," as the Second Circuit panel remarked in affirming the judgment in favor of Saturday Night Live, "copyright law should be hospitable to the humor of parody...." Elsmere Music Co., Inc., 623 F.2d at 253.
 
 
 79
 We should almost certainly be hospitable to the humor of parody if we allowed ourselves to be guided, as the Supreme Court was guided in the Betamax case, "by Justice Stewart's exposition of the correct approach to the ambiguities in the law of copyright." Sony, 464 U.S. at 431, 104 S.Ct. at 783. The cause that is ultimately to be served, Justice Stewart observed in Twentieth Century Music Corp. v. Aiken, 422 U.S. 151, 156, 95 S.Ct. 2040, 2043, 45 L.Ed.2d 84 (1975), is "the cause of promoting broad public availability of literature, music and other arts." What Justice Stewart called the "ultimate aim" of copyright law is "to stimulate artistic creativity for the general public good." Id. (footnote omitted). If we keep this ultimate aim in mind, it seems to me, we are not likely to conclude that parody for profit is presumptively "unfair."
 
 
 80
 * * * * * *
 
 
 81
 The second statutory factor to be considered is
 
 
 82
 "(2) the nature of the copyrighted work...."
 
 
 83
 The pertinent data in this connection are that Orbison and Dees published "Oh, Pretty Woman" long before the alleged infringement occurred, and that theirs is a work of the imagination rather than a piece of historical reportage.
 
 
 84
 That the original song had long since been published is a factor which works in favor of the 2 Live Crew defendants. See Harper & Row, 471 U.S. at 564, 105 S.Ct. at 2232, where the Supreme Court declared that "the scope of fair use is narrower with respect to unpublished works." The fact that "Oh, Pretty Woman" is a creative work might tend to offset the publication factor, perhaps, if the work were not being used for the purpose of parody. But parody routinely sets its sights on the fictive as opposed to the factual. If, as the Second Circuit insists, "parody and satire are deserving of substantial freedom," Berlin, 329 F.2d at 545, it would make no sense at all to penalize the parodist for taking as his subject precisely the sort of work that has been grist for parodists' mills for the last two and a half millennia.
 
 
 85
 * * * * * *
 
 
 86
 The third statutory factor is a somewhat problematical one, where parody is concerned:
 
 
 87
 "(3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole...."
 
 
 88
 The "portion used" test is problematical in this context because parody cannot be parody unless it allows the original work to shine through in a form which, while distorted, is recognizable. "Parody by its nature demands close imitation," Bisceglia, "Parody and Copyright Protection," ASCAP Copyright Law Symposium No. 34 at 17; substantial usage is thus almost a given.
 
 
 89
 The Ninth Circuit has held that the fair use defense must fail when the purported parodists' copying "is virtually complete or almost verbatim." Walt Disney Productions v. Air Pirates, 581 F.2d 751, 756 (9th Cir.1978), cert. denied, 439 U.S. 1132, 99 S.Ct. 1054, 59 L.Ed.2d 94 (1979). I have no quarrel with this formulation; near-verbatim copying is closer to plagiarism than it is to parody. But neither the music nor the lyrics of 2 Live Crew's "Pretty Woman" can fairly be said to constitute near-verbatim copying of the Orbison and Dees original.[5]
 
 
 90
 "At the very least," the Second Circuit has said, a parody will pass muster under the "portion used" factor "where the parodist does not appropriate a greater amount of the original work than is necessary to 'recall or conjure up' the object of his satire...." Berlin, 329 F.2d at 545. Saturday Night Live's "I Love Sodom" was held to pass the "conjure up" test,[6] and 2 Live Crew's "Pretty Woman" does not appear to have appropriated more of the original on which it was based than did "I Love Sodom."
 
 
 91
 The district court (Wiseman, J.) made these observations about the amount and substantiality of the mimicry in the 2 Live Crew song:
 
 
 92
 "In this case, 2 Live Crew has not mimicked so much of 'Oh, Pretty Woman' that it runs afoul of the substantiality factor. Notable aspects of the original song are plainly present in 2 Live Crew's version but, unlike Air Pirates, this is not a case of virtually complete or verbatim copying. Rather this case falls in the realm of parodies envisioned by Fisher and Berlin. In view of the fact that the medium is a song, its purpose is parody, and the relative brevity of the copying, it appropriates no more from the original than is necessary to accomplish reasonably its parodic purpose. Fisher, 794 F.2d at 439." 754 F.Supp. at 1157.
 
 
 93
 I cannot improve on Judge Wiseman's analysis of the substantiality factor.
 
 
 94
 * * * * * *
 
 The last of the statutory factors is this:
 
 95
 "(4) the effect of the use upon the potential market for or value of the copyrighted work."
 
 
 96
 To me, at least, it seems as clear in this case as it did to the Second Circuit in Berlin that "the parody has neither the intent nor the effect of fulfilling the demand for the original...." 329 F.2d at 545.
 
 The affidavit of Oscar Brand says that
 
 97
 "Parodies have never interfered with the popularity of the original. * * * The sales graph of 'Hello, Dolly' didn't change when it became 'Hello, Lyndon,' and 'Hello, Nixon.' Hundreds of popular songs have been 'covered' by parody performances and recordings without altering their popular appeal or interfering with their sales."
 
 
 98
 Although Brand's assertion that parodies have "never" interfered with the popularity of the original strikes me as dubious, there has been no showing of any such interference here.[7] Brand--who is probably on firmer ground when he sticks to the specifics of this case--explains that the audiences for the two songs are quite different:
 
 
 99
 "There is no question in my mind that the song "Oh, Pretty Woman" by Roy Orbison and William Dees was intended for Mr. Orbison's country music audience and middle-America.
 
 
 100
 [ ] On the other hand, 2 Live Crew's version[ ], which is unquestionably a comic parody, is aimed at the large black populace which used to buy what was once called 'race' records. The group's popularity is intense among the disaffected, definitely not the audience for the Orbison song. I cannot see how it can affect the sales or popularity of the Orbison song, except to stimulate interest in the original."
 
 
 101
 Brand's analysis of the market stands unrefuted. One month after Brand gave his affidavit, the plaintiff's Director of Licensing, Gerald Tiefer, executed an affidavit in which there is no attempt to deny that the two songs are aimed at different markets.[8] Mr. Tiefer does suggest, however, that the 2 Live Crew parody could impair the value of the plaintiff's right to grant licenses to parodists. And Mr. Jerry Flowers, Executive Director of Publishing for the plaintiff's parent corporation, says in an affidavit that the licensing of parodies of established hit songs has become extremely lucrative.
 
 
 102
 Judge Joiner invites our attention, in this connection, to Rogers v. Koons, 960 F.2d 301, 312 (2d Cir.1992), where the Second Circuit observed that "the inquiry considers not only harm to the market for the original [work], but also harm to the market for derivative works." In a passage a portion of which was quoted with approval in Harper & Row, 471 U.S. at 568, 105 S.Ct. at 2234, similarly, the Nimmer treatise says that "[i]f the defendant's work adversely affects the value of any of the rights of the copyrighted work ... [including the right to license derivative works,] the use is not fair even if the rights thus affected have not as yet been exercised by the plaintiff." 3 Nimmer on Copyrights, § 13.05[B] at 13-88.19 (1992) (citations omitted).
 
 
 103
 Nimmer, however, is not discussing parody here; the quoted passage deals with a motion picture hypothetically adapted from a copyrighted novel. And neither Rogers v. Koons nor Harper & Row involved parody either. The former was a case in which a sculpture had been copied with great fidelity from a photograph--the artisans who produced the sculpture were told that the "work must be just like photo," 960 F.2d at 305--and the latter was a case in which quotations from the unpublished manuscript of President Ford's autobiography were lifted by the defendant verbatim.
 
 
 104
 Parody, again, is different. It transforms as it copies, and it may well savage the original work in the process. In the past, at least, copyright holders have not been overly enthusiastic about agreeing to see their works parodied--and the law itself has licensed parodists, much as the law has given license to book reviewers, drama critics, and other commentators. Ours is a commercial age, to be sure, and consensual "parody licenses" may be more common now than they used to be. I confess that I am still uneasy, however, about the prospect of the courts turning copyright holders into censors of parody. Neither the history of the fair use doctrine nor the four factors enumerated in the Copyright Act compel such a result. "[P]ermissible parody, whether or not in good taste, is the price an artist pays for success...." MCA, Inc. v. Wilson, 677 F.2d 180, 191 (2d Cir.1981) (Mansfield, J., dissenting).
 
 
 105
 I said earlier in this opinion that there may be factors which, although not enumerated in the Copyright Act, merit consideration by the courts in determining when parody constitutes fair use. I shall mention only one such factor--one foreshadowed in what has already been said. It is this: the social value of the parody as criticism.
 
 
 106
 In the case at bar, it seems to me, this factor militates rather strongly in favor of affirmance of the district court's finding of fair use. The 2 Live Crew "Pretty Woman" is hopelessly vulgar, to be sure,[9] but we ought not let that fact conceal what may be the song's most significant message--for here the vulgarity, to paraphrase Marshall McLuhan, is the message. The original work may not seem vulgar, at first blush, but the 2 Live Crew group are telling us, knowingly or unknowingly, that vulgar is precisely what "Oh, Pretty Woman" is. Whether we agree or disagree, this perception is not one we ought to suppress.
 
 
 
 *
 Honorable Charles W. Joiner, United States District Court for the Eastern District of Michigan, sitting by designation
 
 
 [1]
 We use the term "album" generically; "As Clean As They Wanna Be" was also released on compact disc and cassette tape
 
 
 [2]
 The parties dispute the above chronology. Defendants contend that Campbell intended all along to create a comic song and appropriately sought the permission of Acuff-Rose prior to doing so. Acuff-Rose sees Fine's letter as a effort to create a revisionist history of legitimacy for an act of piracy. The district court found that "As Clean As They Wanna Be" was released on July 15, 1989, subsequent to Fine's letter to Tiefer. Campbell's intent is not dispositive of the case, but we note that this finding contradicts Campbell's affidavit. The only support in the record for a July 15 release date is found in Acuff-Rose's response to the motion for dismissal, in which counsel asserted a release date "on or about July 15, 1989." Campbell's affidavit is a better factual source than counsel's contention
 
 
 [3]
 At oral argument, counsel for 2 Live Crew stated that the deposit was a tactical mistake which should not be construed as an admission that the group's song was something other than a fair use parody. Our review of the record reveals confusion over the status of "Pretty Woman" as either a "comic" effort, such as those created by comic musician Weird Al Yankovic, or a "parody," which purports to deliver social commentary within a humorous framework. Yankovic's works are licensed uses, not "fair uses" for which a license is not required. This confusion on the part of 2 Live Crew adds weight to Acuff-Rose's assertion that Campbell's intent to create a parody was only formed after "Pretty Woman" was released
 
 
 [4]
 2 Live Crew also presented the affidavit of M. William Krasilovsky, whose conclusions and the reasons therefore are much the same as Brand's
 
 
 [5]
 The district court also determined that Acuff-Rose's pendent state law claims were preempted by section 301 of the Copyright Act. Acuff-Rose Music, 754 F.Supp. at 1159-60. Acuff-Rose does not challenge this determination
 
 
 [6]
 Acuff-Rose also sought leave to amend its complaint to allege violations of the Lanham Act. 15 U.S.C. § 1125(a). The district court denied the motion and Acuff-Rose does not allege error in the denial
 
 
 [7]
 See, S.Rep. No. 94-473, 94th Cong., 1st Sess. at 61-62 (1975); H.R.Rep. No. 94-1476, 94th Cong., 2d Sess. at 65 (1976)
 
 
 [8]
 We do so with considerable reservation, as the district court's parody analysis does not, in our view, comport with proper analysis of that term
 The district court compared the statement of the parties' affiants and concluded: "Acuff-Rose may not like it, and 2 Live Crew may not have created the best parody of the original, but nonetheless the facts convincingly demonstrate that it is a parody." Acuff Rose, 754 F.Supp. at 1155. The district court closely parsed the lyrics of the two songs, finding that: "Although the parody starts out with the same lyrics as the original, it quickly degenerates into a play on words, substituting predictable lyrics with shocking ones." Id. 2 Live Crew contends that by way of the "shocking" lyrics "Pretty Woman" was intended to satirize the original work, as well as society at large. Our difficulty with the district court's conclusion that this intention was realized is that, even accepting that "Pretty Woman" is a comment on the banality of white-centered popular music, we cannot discern any parody of the original song. Failing a direct comment on the original, there can be no parody, as the "copied work must be, at least in part, an object of the parody, otherwise there would be no need to conjure up the original work." Rogers, 960 F.2d at 310 (citing MCA, Inc., 677 F.2d at 185).
 In the copyrighted song, the singer remarks on the beauty of a woman he sees on the street. The singer is initially disappointed when the woman rebuffs his advances and later exults when the woman appears to change her mind. Campbell's lyrics involved women but aside from broadly evoking the theme of the original in the opening line of the 2 Live Crew version: "Pretty Woman--Walkin' down the street, Pretty Woman--Girl you look so sweet," bear no discernible relationship to the original. Instead, as Brand noted, the lyrics examine a series of women with unappealing attributes: "Big Hairy Woman--You need to shave that stuff, Big Hairy Woman--You know I bet it's tough, Big Hairy Woman--All that hair it ain't legit, 'Cause you look like 'cousin it,' Big Hairy Woman," or who are not faithful: "Two Timin' Woman--Girl you know you ain't right, Two Timin' Woman--You's out with my boy last night, Two Timin' Woman--That takes a load off my mind, Two Timin' Woman--Now I know the baby ain't mine."
 In our opinion, this is not a new work which makes ridiculous the style and expression of the original, although there is plainly an element of the ridiculous to the new work. We cannot see any thematic relationship between the copyrighted song and the alleged parody. The mere fact that both songs have a woman as their central theme is too tenuous a connection to be viewed as critical comment on the original. We find instructive the holding in Elsmere v. National Broadcasting Co., 482 F.Supp. 741 (S.D.N.Y.1980), aff'd per curiam, 623 F.2d 252 (2d Cir.1980). The Court of Appeals for the Second Circuit agreed with the district court that the company of the television program "Saturday Night Live" had performed a parody--entitled "I Love Sodom"--of the then-widely known advertising jingle "I Love New York." The new work cast the original image-polishing effort as ridiculous by asserting that the effort to redeem New York City's image was futile. It is this sort of direct comment, comment which is expressly and unambiguously directed at the message of the original work, which constitutes a parody. Similarly, the court in Rogers found that a sculpture based upon a copyrighted photograph was not a parody regardless of the creator's alleged intention to point out the banality of the copyrighted work. Rogers, 960 F.2d at 309-10. The new work, the court found, could perhaps be seen as a critique of materialistic society at large, but on its face the sculpture failed to make critical comment regarding the original creative work. Id. We are in agreement with the Rogers court that the term parody cannot be allowed to assume too broad a definition, for if an "infringement of a copyrightable expression could be justified as a fair use solely on the basis of the infringer's claim to a higher or different artistic use ... there would be no practicable boundary to the fair use defense." Id. at 310.
 
 
 [1]
 As Berlin points out, 329 F.2d at 544-45, Loew's has been widely criticized. Among the critics is no less a figure than Professor (later Justice) Benjamin Kaplan. See Kaplan, An Unhurried View of Copyright (1967) at 69. The Ninth Circuit has said that its Loew's decision "was essentially repudiated by Congress's recognition of parody in the notes to the Copyrights Act of 1976." Fisher v. Dees, 794 F.2d 432, 435 (9th Cir.1986), citing 17 U.S.C.A. § 107 Historical Note. (The Note quotes House Report No. 94-1476 as listing "use in a parody of some of the content of the work parodied" as among "the sort of activities the courts might regard as fair use under the circumstances.")
 
 
 [2]
 There are, to be sure, authorities who would constitutionalize copyright law. Some would treat satire as sacrosanct under the First Amendment. See, e.g., Goetsch, "Parody as Free Speech--The Replacement of the Fair Use Doctrine By First Amendment Protection," 3 W.New Eng.L.Rev. 39 (1980). Others would accord constitutional protection to any parody a limitation on which would, in the opinion of the judge, impede "the Progress of Science" as that phrase is used in the Copyright Clause, Art. I, § 8 of the Constitution. See Bisceglia, "Parody and Copyright Protection: Turning the Balancing Act Into a Juggling Act," ASCAP Copyright Law Symposium No. 34 (1987) at 23. As for me, I cannot work up much enthusiasm for turning every copyright case into a mini- Marbury v. Madison [5 U.S. 137, 1 Cranch 137, 2 L.Ed. 60] or New York Times Co. v. Sullivan [376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686.] The major role in determining how to promote the progress of science has been given, after all, to Congress: "As the text of the Constitution makes plain, it is Congress that has been assigned the task of defining the scope of the limited monopoly that should be granted to authors or to inventors...." Sony Corp. v. Universal City Studios, Inc., 464 U.S. 417, 429, 104 S.Ct. 774, 782, 78 L.Ed.2d 574 (1984). The Ninth Circuit has rejected out of hand the notion that the First Amendment gives parodists a blanket protection from copyright infringement actions. Fisher v. Dees, 794 F.2d 432, 434 n. 2 (9th Cir.1986)
 
 
 [3]
 VII Encyclopedia Britannica (15th ed. 1975) at 768. "Parodeia" joins the Greek words for "beside" and "to sing"--the roots of our prefix "para" and our word for a lyric poem, "ode." Webster's New International Dictionary (3d ed. 1961)
 
 
 [4]
 See also Note, "The Parody Defense to Copyright Infringement: Productive Fair Use After Betamax," 97 Harv.L.Rev. 1395 (1984): "Parody, in its purest form, is the art of creating a new literary, musical, or other artistic work that both mimics and renders ludicrous the style and thought of an original." The examples cited by the Harvard editors are Cervantes' Don Quixote (1614), Pope's The Rape of the Lock (1712), and Austen's Northanger Abbey (1818), all of which parodied then-popular literary genres. Judge Yankwich provides a much longer list of well known parodies in his article "Parody and Burlesque in the Law of Copyright," 33 Can.B.Rev. 1131 (1955). The art form goes back at least as far as Aristophines, the famous comic dramatist of ancient Greece, whose play The Frogs (405 B.C.)--a work still performed today--spoofed the plays of Aeschylus and Euripides
 Parodies often outlast and outshine the works parodied. A good example is Lewis Carroll's "You Are Old, Father William," a takeoff on Southey's work "The Old Man's Comforts." The texts, which are strikingly similar in form, may be read side-by-side in the appendix to Bisceglia, "Parody and Copyright Protection: Turning the Balancing Act into a Juggling Act," ASCAP Copyright Law Symposium No. 34 (1987) at 37-38.
 
 
 [5]
 I recognize that the affidavit of musicologist Earl Spielman refers to a "one measure guitar lick" that "may have actually been sampled or lifted and then incorporated into the recording of 'Pretty Woman' as performed by The 2 Live Crew." But the Copyright Act "protects only those sound recordings 'fixed' on or after February 15, 1972," Note, "Digital Sound Sampling, Copyright and Publicity: Protecting Against the Electronic Appropriation of Sounds," 87 Col.L.Rev. 1723, 1727-28 (1987), citing 17 U.S.C. § 301(c); Orbison and Dees recorded "Oh, Pretty Woman" in 1964. It is arguable, moreover, that a "sampling" of no more than a few notes should be governed by the maxim de minimis non curat lex. Id. at 1735. Finally, the plaintiffs have not shown by a preponderance of the evidence that any sampling really occurred here--and to my untrained ear, at least, it is obvious that most of the 2 Live Crew music was not lifted electronically from the 1964 recording
 
 
 [6]
 The Second Circuit noted by way of dictum in that case that "[e]ven more extensive use [than that necessary to 'conjure up' the original] would still be fair use, provided the parody builds upon the original, using the original as a known element of modern culture and contributing something new for humorous effect or commentary." 623 F.2d at 253 n. 1. Professor Nimmer's treatise asserts that "[t]his went too far," adding that "[t]he Second Circuit later drew back from this extreme...." 3 Nimmer on Copyright, § 13.03[f] at 13-90.9-.10 (1992), citing Warner Bros., Inc. v. American Broadcasting Companies, 654 F.2d 204 (2d Cir.1981), and MCA, Inc. v. Wilson, 677 F.2d 180 (2d Cir.1981). I am by no means sure that the Elsmere dictum did go too far, but it makes no difference in the case at bar; the 2 Live Crew song passes the "conjure up" test in any event
 
 
 [7]
 Because parody is a special case, moreover, a drop in the popularity of the original "Oh, Pretty Woman" would be of doubtful relevance anyway. "[W]e must accept the harsh truth that parody may quite legitimately aim at garroting the original, destroying it commercially as well as artistically." Kaplan, An Unhurried View of Copyright, at 69
 
 
 [8]
 This case is thus different from New Line Cinema Corp. v. Bertlesman Music Group, 693 F.Supp. 1517 (S.D.N.Y.1988), where testimony "unequivocally established that the songs 'Nightmare on My Street' and 'Are You Ready for Freddy?' are in direct competition." Id. at 1528
 
 
 [9]
 Vulgarity, in practice, probably cuts against acceptance of the parody defense. See MCA, Inc. v. Wilson, 677 F.2d 180, 185 (2d Cir.1981), where the panel majority said this:
 "We are not prepared to hold that a commercial composer can plagiarize a competitor's copyrighted song, substitute dirty lyrics of his own, perform it for commercial gain, and then escape liability by calling the end result a parody or satire on the mores of society." MCA, Inc. v. Wilson, 677 F.2d 180, 185 (2d Cir.1981).
 I have some sympathy for this attitude, particularly where the parties really are "competitors;" be the lyrics of the derivative work dirty or clean, it goes against the grain to let a competitor reap where he has not sown. In the case at bar, however, there has been no showing that the parties are competitors. The 2 Live Crew song, moreover, is not just "a parody or satire on the mores of society"--it is a parody or satire on the mores of Orbison's Pretty Woman and her admirer.